# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NAKIA JACKSON, et al.           :
                                :     Civil Action No. 16-cv-02353 (GEKP)
    Plaintiffs               :
                                :
    v.                       :
                                :
SWEET HOME HEALTHCARE           :
LLC, et al.                     :
                                :
    Defendants               :

---

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FLSA CONDITIONAL COLLECTIVE ACTION CERTIFICATION AND JUDICIAL NOTICE

---

On the Brief:

WEIR & PARTNERS LLP
By:   Steven E. Angstreich
       Carolyn C. Lindheim
       Amy R. Brandt
Suite 500
1339 Chestnut Street
Philadelphia, PA 19107
215-665-8181
215-665-8464 fax
sangstreich@weirpartners.com
clindheim@weirpartners.com
abrandt@weirpartners.com
Attorneys for Plaintiffs

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................................i

TABLE OF CITATIONS ...............................................................................ii

I.     PRELIMINARY STATEMENT .............................................................1

II.    SUMMARY OF RELEVANT FACTS ...................................................3

III.   APPLICABLE LEGAL STANDARD ..................................................10

IV.    LEGAL ARGUMENT.........................................................................14

       A.   All Healthcare Workers Denied Overtime Pay by Defendants Are ..........14
            Similarly Situated for the Purpose of Conditional Certification.

            1.   Workers Are All Victims of Defendants' Uniform Policy of .......14
                 Failing to Pay Overtime.

            2.   Workers Need Only Show They Are Similarly Situated, Not.......15
                 Identically Situated, for Purposes of Conditional Certification.

       B.   Court Facilitated Judicial Notice is Appropriate. ......................................17

V.     CONCLUSION...................................................................................19

# TABLE OF CITATIONS

**Cases**                                                                                                **Page**

*Aquilino v. The Home Depot, Inc.*, No. 04-CV-4100 ......................................................12
  2006 WL 2583563 (D.N.J. Sept. 7, 2006)

*Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668 .............................................16
  (1st Cir. 1998)

*Bosley v. Chubb Corp.*, No. 04-CV-4598 ..................................................................12
  (2005 WL 1334565 (E.D. Pa. June 3, 2005)

*Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988) .............................................16

*Chabrier v. Wilmington Fin., Inc.*, No. 06-4176...................................................12,13,15
  2008 WL 038872 (E.D. Pa. Apr. 4, 2008)

*De Asencio v. Tyson Foods, Inc.*, 130 F. Supp. 2d 660 .....................................................13
  (E.D. Pa. 2001)

*Goldman v. RadioShack Corp.*, No. 2:03-CV-0032 ......................................................12,13
  2003 WL 21250571 (E.D. Pa. Apr. 16, 2003)

*Harris v. Healthcare Servs. Group, Inc.*, No. 06-2903...................................................12,13
  2007 WL 2221411 (E.D. Pa. July 31, 2007)

*Hoffmann-La Roche v. Sperling, et al.*, 493 U.S. 165 (1989)..................................11,17,18

*Houston v. URS Corp.*, 591 F. Supp. 2d 827 (E.D. Va. 2008).............................................16

*Loomis v. Cusa LLC*, 257 R.F.D. 674 (D. Minn. 2009)......................................................19

*Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493 .......................................12,13
  (D.N.J. 2000)

*Moss v. Crawford & Co.*, 201 F.R.D. 398 (W.D. Pa. 2000)...........................................13,15

*Mueller v. CBS, Inc.*, 201 F.R.D. 425 (W.D. Pa. 2001).....................................................13

*Oliver v. Aegis Comme'ns Group, Inc.*, 2008 WL 7483891...............................................19
  (N.D. Tex., Oct. 30, 2008)

*Pontius v. Delta Fin. Corp.*, No. 04-1737.......................................................................12
  2005 WL 6103189 (W.D. Pa. July 22, 2005)

*Redman v. U.S. W. Bus. Res., Inc.*, 153 F.3d 691 (8th Cir. 1998) ........................................17

*Ruggles v. WellPoint, Inc.*, 591 F. Supp. 2d 150 (N.D.N.Y. 2008) ..............................12,17

*Scott v. Heartland Home Fin., Inc.*, 2006 WL 1209813 ...............................................15
  (N.D. Ga. May 3, 2006)

*Shain v. Armour & Co.*, 40 F. Supp. 488 (W.D. Ky. 1941).................................................11

*Smith v. Sovereign Bancorp., Inc.*, No. Civ. A. 03-2420 ..................................................13
  (2003 WL 22701017 (E.D. Pa. Nov. 13, 2003)

*Taylor v. Pittsburgh Mercy Health Sys., Inc.*, No. A-09-377 .......................................11,17
  2009 WL 1324045 (W.D. Pa. May 11, 2009)

*Wilson v. Guardian Angel Nursing, Inc.*, No. 3:07-0069 .................................................16
  2008 WL 4890589 (M.D. Tenn. Nov. 12, 2008)

*Woodard v. FedEx Freight East Inc.*, 250 F.R.D. 178 (M.D. Pa. 2008) .....................12,13


**Rule**

F.R.C.P. 23 ...........................................................................................................11,17


**Statutes**

29 U.S.C. § 201............................................................................................. 1, passim
29 U.S.C. § 203(d)...............................................................................................11
29 U.S.C. § 203(e)(1)...........................................................................................11
29 U.S.C. § 207(a)(1)...........................................................................................10
29 U.S.C. § 216(b).........................................................................................2,11,17

43 Pa. St. Ann. § 333.10 ........................................................................................1

## I.   PRELIMINARY STATEMENT

On or about May 13, 2016, Plaintiffs Nakia Jackson ("N. Jackson"), Sarita Cave ("Cave"), Shatia Jackson ("S. Jackson"), Tina Williams ("Williams") and Lawrence Harris ("Harris"), filed the within action seeking, among other things, overtime pay pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), and the Pennsylvania Wage Payment and Collection Law, 43 Pa. St. Ann. § 333.10, *et seq.* ("PWPCL").[1]

Defendant, Sweet Home Healthcare LLC ("Sweet Home Healthcare"), was established in May 2012 for the purpose of providing home health care services.  (Exhibit "1", Plaintiffs' Complaint at ¶18)  Defendant, Sweet Home Primary LLC ("Sweet Home Primary") is an alter ego of Sweet Home Healthcare.  (Id. at ¶19)  Sweet Home Healthcare and Sweet Home Primary (collectively, "Sweet Home Defendants") directly employ home health aides ("Home Health Aides") and direct care workers ("Direct Care Workers", collectively "Workers") to provide home care support and services to elderly and disabled clients such as medical assistance, companionship services, homemaking services and other home care services inside the clients' household.  (Id. at ¶20)  The Sweet Home Defendants directly employ and pay hourly wages to the Home Health Aides and Direct Care Workers, though Defendants misclassify some of those Workers as independent contractors and issue them a form 1099.  (Id. at ¶¶21,25,28)  Nonetheless, pursuant to the relevant labor law's definitions, each of the Workers are "employees" of the Sweet Home Defendants and thus, are entitled to overtime pay for hours worked in excess of forty (40) per work week.  (Id.)

---

[1] A true and correct copy of Plaintiffs' Complaint is attached hereto as Exhibit "1".  On August 8, 2016, Defendant filed a Motion to Dismiss, which in essence challenges when workers such as Plaintiffs began to be entitled to overtime pay under the FLSA.  Oral argument was held on the Motion on October 28, 2016.  To date, no Answer has been filed.

Plaintiffs, were at all relevant times, Workers hired by Defendants to provide home health services to Defendants' clients ("Clients"). (Id. at ¶¶20,27)  In so employing, Defendants required all of its Workers to follow the same uniform policies regarding time recordation and reporting and the payment of a straight hourly rate. (Id. at ¶30)  Defendants' Workers perform services needed by Defendants' Clients at the times and at locations the Workers are assigned by Defendants. (Id. at ¶20,27)  Defendants supervise the Workers throughout their assignments, typically through continuous communications with the Workers and the Clients. (Id. at ¶27)  For this work, the Workers are then paid directly by Defendants' joint accounting department, according to Defendants' timesheets, and are subject to the same uniform policies. (Id. at ¶¶30, 43)  However, Defendants pay some Workers as W-2 employees, as to whom Defendants apply the same policies regarding pay rates, deductions, adjustments, and/or withholdings; and as to the others, Defendants misclassify them as 1099 Workers, applying the same policies regarding pay rates, but without making the appropriate deductions. (Id. at ¶¶30,31,50,51)  Despite Defendants' erroneous distinction between the Workers, all are treated the same with respect to overtime pay – that is Defendants uniformly and consistently denied and continue to deny all Workers overtime compensation as required by the FLSA for hours worked in excess of forty in a workweek. (Id. at ¶¶30, 31)

To assert a right to overtime compensation, Plaintiffs filed this action on behalf of themselves and all similarly situated Workers, alleging, among other things, that Defendants, as their employers and their principals (Defendants Tekia Emerson and Darryl Ezell), wrongfully denied them and other Workers of overtime compensation.

Plaintiffs now move to conditionally certify this action pursuant to 29 U.S.C. § 216(b) so that the Workers can be notified of their right to join this lawsuit.  A class is conditionally certified

and notice is authorized when a plaintiff can satisfy his fairly lenient burden by sufficiently alleging the existence of a group of "similarly situated" individuals.  Plaintiffs and other Workers are indeed similarly situated in their relationship to Defendants and, most importantly, in Defendants' uniform failure to pay them overtime pay.  The proposed class is similarly situated enough to receive judicial notice and to proceed with collective discovery under the lenient first stage FLSA conditional certification standard.  For these reasons, as discussed in detail below, Plaintiffs' Motion for Conditional Certification should be granted.

## II.   SUMMARY OF RELEVANT FACTS

The Sweet Home Defendants directly employ and pay hourly wages to the Workers. (Exhibit "1" at ¶¶20-21)  The Sweet Home Defendants are Medicare certified agencies.  A Medicare certification means that the agency has met federal minimum requirements for patient care and therefore Medicare and/or Medicaid will pay for covered home health services.  (Id. at ¶22)  The Workers are both Home Health Aides and Direct Care Workers.  The Home Health Aides are monitored by a registered nurse on a frequent basis and are required to have 75 hours of training prior to being assigned.  Defendants also provide Direct Care Workers to provide home care services, the only difference being the level of training each aide has – that is, the direct care worker is only required to have 40 hours of training prior to assignment.  (Id. at ¶¶23-25) Defendants' payroll practices are uniform among the Home Health Aides and Direct Care Workers.  Similarly, though Defendants misclassify some Workers as independent contractors, both are "employees" of the Sweet Home Defendants pursuant to the relevant labor law's definitions.  (Id. at ¶38)  The Sweet Home Defendants are required to be licensed and meet regulatory requirements; including, among other things, maintaining liability insurance, providing benefits and paying taxes for the Workers.  (Id. at ¶¶22,26)

Plaintiffs and the Class Members they propose to represent are Workers dispatched by Defendants to provide care to the Sweet Home Defendants' clients within the client's home. Plaintiffs and the Class Members are employed by the Sweet Home Defendants and do not have any direct or indirect employment relationship with the Defendants' Clients. (Id. at ¶¶20,21,27,28) Plaintiffs and the Class Members frequently work in excess of 40 hours per workweek and, according to payroll records produced in discovery have worked hundreds of thousands of overtime hours since January 1, 2014.  (Id. at ¶30)  (Exhibit "2", Declaration of Amy R. Brandt, Esquire)  At all times since January 1, 2014, Defendants have uniformly refused to pay Plaintiffs and the Class Members the time and one half overtime premium for hours worked over 40 hours in a workweek.  (Exhibit "2" at ¶14)[2]  Instead, Defendants paid and continue to pay Plaintiffs and the Class Members their straight hourly wage for all hours worked, including overtime work. (Exhibit "1")  Defendants' failure to pay Plaintiffs and the Class Members the time and one half overtime premium for hours worked in excess of 40 hours in a workweek has resulted in Plaintiffs and the Class Members being significantly underpaid.  (Id. at ¶31)

That Plaintiffs and the proposed Class Members are similarly situated with regard to Defendants' failure to pay overtime wages is also demonstrated by a sampling of Plaintiffs' pay stubs as set forth below and the January 1, 2014 - October 31, 2016 payroll records produced by Defendants.

Plaintiff, Sarita Cave, became employed by the Sweet Home Defendants on March 25, 2015.  From approximately March 25, 2015 to December 2015, she provided services to the Sweet Home Defendants' Clients in the Clients' households.  During that time, she was uniformly paid

---

[2] For a small group of works, Defendants have manipulated their regular hourly rates to create the false appearance that overtime is being paid. (Exhibit "2", Declaration of Amy R. Brandt at ¶17)

an hourly wage of $13.00 per hour.  However, she often worked over 40 hours per workweek.  For example, as indicated by the paystub attached as Exhibit "A" to Plaintiffs' Complaint, she was credited with working 50.75 hours during the one week period of March 30, 2015 and April 5, 2015, but was only paid the sum of $659.75 ($13.00 multiplied by 50.75 hours).[3]  Throughout her employment with the Sweet Home Defendants, Plaintiff Cave never received the time and one half overtime premium for hours worked over a 40 hour workweek.  Instead, she only received her straight hourly wage of $13.00 for overtime work.[4]  According to Defendants' payroll records, she was deprived of $641.50 for 71 hours of overtime pay.  (Exhibit "2", Declaration of Amy R. Brandt at ¶ 10)

Plaintiff Nakia Jackson became employed by the Sweet Home Defendants on September 10, 2015.  From approximately September 10, 2015 to December 2015, she provided services to the Sweet Home Defendants' Clients in the Clients' households.  During that time, Plaintiff N. Jackson was uniformly paid an hourly wage of $13.00 per hour.  However, she regularly worked over 40 hours per workweek.  For example, as indicated by the paystub attached as Exhibit "B" to Plaintiffs' Complaint, Nakia Jackson was credited with working 82 hours during the one week period of September 28, 2015 and October 4, 2015, but was only paid the sum of $1,056 ($13.00 multiplied by 82 hours).  Throughout her employment with the Sweet Home Defendants, Nakia Jackson never received the time and one half overtime premium for hours worked over a 40 hour workweek.  Instead, she only received her straight hourly wage of $13.00 for overtime work.

---

[3] Additional pay records for each Plaintiff are attached hereto as part of Plaintiff's Initial Disclosures (Exhibit "4") and reflect multiple work weeks during which each was deprived of overtime pay for work in excess of 40 hours.

[4] Declarations are additionally provided herewith by Plaintiffs Cave, Shatia Jackson, Lawrence Harris and Tina Williams which confirm the allegations set forth in the Complaint.  (Exhibit "3")

According to Defendants' payroll records, she was deprived of $754.00 for 116 hours of overtime pay. (Exhibit "2", Declaration of Amy R. Brandt at ¶ 10)

Plaintiff Shatia Jackson became employed by the Sweet Home Defendants on October 15, 2014. From approximately October 15, 2014 to approximately January 2016, she provided services to the Sweet Home Defendants' Clients in the Clients' households. Shatia Jackson was initially paid $12.00 per hour and thereafter, $13.00 per hour as a 1099 worker. However, she often worked over 40 hours per workweek. For example, as indicated by the paystub attached as Exhibit "C" to Plaintiffs' Complaint, she was credited with working 84 hours during the one week period of January 4, 2016 and January 10, 2016 but was only paid the sum of $1,092 ($13.00 multiplied by 84 hours). Throughout her employment with the Sweet Home Defendants, Shatia Jackson never received the time and one half overtime premium for hours worked over a 40 hour workweek. Instead, she only received her straight hourly wage of $13.00 for overtime work. According to Defendants' payroll records, she was deprived of $1,200.25 for 190.50 hours of overtime pay. (Exhibit "2", Declaration of Amy R. Brandt at ¶10)

Plaintiff Lawrence Harris became employed by the Sweet Home Defendants in the fall of 2014. In that capacity, he provided services to the Sweet Home Defendants' Clients in the Clients' households. Plaintiff Harris was uniformly paid an hourly wage of $12.00 per hour. Nonetheless, he regularly worked over 40 hours per workweek, and was paid interchangeably as a W-2 and 1099 worker. For example, as indicated by the paystub attached as Exhibit "D" to the Complaint, he was credited with working 83.50 hours during the one week period of May 22, 2015 and May 28, 2015 but was only paid the sum of $1,002.00 ($12.00 multiplied by 83.50 hours). Throughout most of his employment with the Sweet Home Defendants, Plaintiff Harris never received the time and one half overtime premium for hours worked over a 40 hour workweek. Instead, he only

received his straight hourly wage of $12.00 for overtime work.  Most recently, his hourly rate was reduced to create the false appearance that he is presently being compensated for overtime. According to Defendants' payroll records, he was deprived of $9,687.00 for 1,614.50 hours of overtime pay. (Exhibit "2", Declaration of Amy R. Brandt at ¶10)

Plaintiff Tina Williams became employed by the Sweet Home Defendants on October 15, 2014.  Upon her employment, she filled out a W-4 form as requested by Defendants and understood she would be an employee of the Sweet Home Defendants, although she was paid as a 1099 worker.  From approximately October 15, 2014 to December 2015, she provided services to the Sweet Home Defendants' Clients in the Clients' household.  Plaintiff Williams was uniformly paid an hourly wage of $13.00 per hour.  However, she regularly worked over 40 hours per workweek. For example, as indicated by the paystub attached as Exhibit "E" to Plaintiffs' Complaint, she was credited with working 101 hours during the one week period of December 21, 2015 and December 27, 2015, but was only paid the sum of $1,313.00 ($13.00 multiplied by 101 hours).  Throughout her employment with the Sweet Home Defendants, Plaintiff Williams never received the time and one half overtime premium for hours worked over a 40 hour workweek.  Instead, Williams only received her straight hourly wage of $13.00 for overtime work.[5]  According to Defendants' payroll records, she was deprived of $2,852.00 for 501.50 hours of overtime pay.  (Exhibit "2", Declaration of Amy R. Brandt at ¶10)

On or about September 9, 2016, the parties exchanged their initial Disclosures.  On that same date, Defendants produced documents, the majority of which were payroll records for the year 2015 for approximately 900 employees. (Exhibit "2", Brandt Declaration at ¶5)  That

---

[5] Plaintiffs' Initial Disclosures are attached hereto Exhibit "4".  They include additional pay records which demonstrate work weeks during which each named Plaintiff worked in excess of 40 hours without being compensated for overtime.  (Id. at ¶20)

7

production was incomplete as it did not address the complete timeframe, however, it afforded Plaintiffs' counsel an opportunity to analyze the wages paid to these employees. (Id. at ¶6) Those records revealed that the failure to pay overtime was Defendants' regular practice. (Id. at at ¶7)

In or about November-December 2016, Defendants served additional payroll records purporting to be the complete records for Defendants' employees from January 1, 2014 through October 31, 2016. (Id. at ¶9) Defendants also provided an employee list of 2983 workers and employee records for 1,482 of them. Unfortunately, this production was still deficient in light of the records missing for 1501 employees. (Id. at ¶12) Defendants contend that they no longer have these records because they allegedly have been confiscated by the Attorney General's Office in furtherance of an ongoing investigation. (Id. at ¶13) Thus, on March 7, 2017, Plaintiffs issued a subpoena to Wells Fargo Bank, N.A., Defendants' payroll processing service, requesting the records for those 1501 employees. The subpoena is returnable on March 21, 2017. (Id. at ¶14)

Nonetheless, from the records that were produced, it is evident that there are approximately 1261 employees who, like the proposed Class Plaintiffs, have been deprived of overtime pay from January 1, 2014 through October 31, 2016. (Id. at ¶14) Data from 18,258 payroll records on which it appeared that Defendants' employee was deprived overtime was entered on an Excel spreadsheet, representing 1261 distinct employee numbers (each employee is assigned a number, although on occasion a single employee may have been assigned two different numbers). The spreadsheet was designed to calculate the amount of overtime which the employee should have been paid, but was not paid, revealing that Defendants failed to pay its employees approximately $1,785,817.31 in overtime pay. (Exhibit "5", Id. at ¶15-16)

A second spreadsheet was created designed to capture workers who were actually paid overtime, but whose hourly rate had been manipulated by Defendants so that their weekly pay was

not increased. (Id. at ¶17)  For example, employee number 1709 had been earning $12 per hour. When he worked a week in excess of 40 hours, Defendants reduced his regular rate to make his weekly pay equivalent to his pay prior to paying overtime.  That is, prior to being paid overtime pay, he had been paid $12 per hour for a 45.5 hour work week, for a total of $546.00.  When Defendants paid him overtime, they adjusted his regular rate to $11.32 for the first 40 hours and paid an overtime rate of $16.98 so that his total weekly pay remained at $546 for the 45.5 hours worked.  (Id. at ¶17)  The data from 1,216 payroll records were charted on the second spreadsheet. The underpaid overtime for these workers totaled $110,512.89. (Id. at ¶18)

Thus, based on the records produced to date, there are approximately 1200 workers similarly situated; and the damages suffered by the Class is at least $1,896,330.20.[6]  Defendants' mistreatment of its workers *vis-à-vis* their failure to pay overtime pay is widespread and pervasive and the experiences of the five (5) proposed Class Representatives are similar to that of Defendants' employees as a whole for the time period of at least January 1, 2014 through August 2016. (Exhibit "2" at ¶18-19)

In addition to failing to pay overtime, Defendants' recordkeeping and payroll practices are deficient.  While the January 1, 2014-October 31, 2016 records that have been produced are more than sufficient to establish a pattern of Defendants' failure to pay overtime, they also establish the deficiencies in Defendants' record-keeping.  (Id. at ¶19)

Finally, while Plaintiffs Cave, N. Jackson, S. Jackson and Harris were all classified by Defendants as W-2 employees of Defendants, Plaintiffs S. Jackson, Williams, and at times Harris

---

[6] If the Defendants are correct that the FLSA claims do not begin until January 1, 2015 after the exemption was eliminated, and thus, overtime pay from 2014 is excluded, the 1,257 Workers for whom we do have records from January 1, 2015 through October 31, 2016, were deprived of $1,815,243.96 in overtime pay. (Exhibit "2", n. 1)

and several other persons hired by Defendants are and were classified by Defendants as if they were 1099 contractors, and compensated as such.  Thus, Plaintiffs Cave, N. Jackson, and Harris,[7] seek to represent themselves and a class of other Workers similarly situated (the "W-2 Class"). Plaintiff Williams and S. Jackson seek to represent themselves and the class of other 1099 Workers who were and are in fact employees under the applicable law and eligible for overtime under the FLSA (the "1099 Class").

Though Plaintiffs propose two separate subclasses, they intend to move for summary judgment to seek a ruling as to the misclassification of the 1099 Workers such that ultimately all of the Workers will be part of the same Class.  Thus, both the W-2 Class and 1099 Class will be referred to collectively as the "Class" or "Class Members".   Regardless of Defendants' misclassification of some of its Workers, all of the Workers are similarly situated for purposes of their claims in this action for the overtime compensation that Defendants have uniformly denied (and continue to deny).  Defendants have represented that there are approximately 1,000 Workers similarly situated who are either presently working or worked for Defendants and were unlawfully denied overtime compensation – the records themselves identify 1261 distinct employee numbers associated with Workers who have been deprived overtime pay (and others who were underpaid because of the manipulated rates). (Exhibit "2" at ¶14)

## III.   APPLICABLE LEGAL STANDARD

The FLSA requires employers to pay qualified employees time-and-a-half for any overtime hours worked during a week. 29 U.S.C. § 207(a)(1).  The FLSA defines "employee" as "any individual employed by an employer," and defines "employer" broadly as "any person acting

---

[7] Harris and other employees were classified both as a 1099 worker and a W-2 employee at different times, although their employment with Defendants never appear to have changed.

directly or indirectly in the interest of an employer in relationship to an employee . . . ." 29 U.S.C. § 203(d) and (e)(1)  Defendants do not compensate any of its employees overtime pay, including those they have classified as employees and those they have misclassified as "independent contractors."

When such alleged violations affect a group of similarly situated workers, the FLSA, 29 U.S.C. § 216(b), permits the courts to certify the proposed group as a collective action. The collective action mechanism in the FLSA provides for "one lawsuit in which the claims of different employees, different in amount but all arising out of the same character of employment, can be presented and adjudicated, regardless of the fact that they are separate and independent of each other." *Shain v. Armour & Co.*, 40 F. Supp. 488, 490 (W.D. Ky. 1941).  In *Hoffmann-LaRoche v. Sperling, et al.*, 493 U.S. 165 (1989) the United States Supreme Court identified the main benefits of a collective action under § 216(b):  "A collective action allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources."  493 U.S. 165, 169-70 (1989).  "The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged . . . activity." *Id.* at 170.

In providing for a collective action, the FLSA states:

> An action . . . may be maintained against any employer ... in any Federal or State court of competent jurisdiction by any one or more employees for and on behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b) (emphasis added).  Unlike Rule 23 class actions, this collective action mechanism causes potential plaintiffs' statutes of limitations to continue running until the person affirmatively opts into the case. *Taylor v. Pittsburgh Mercy Health Sys., Inc.*, No. A-09-377, 2009 WL 1324045, at *1 (W.D. Pa. May 11, 2009).  Therefore, "'time [is] of the essence' for the

purposes of FLSA notice '[b]ecause the . . . statute of limitations is not tolled [until] a potential

plaintiff opts in[to]' the proposed collective action." *Id.* (quoting *Ruggles v. WellPoint, Inc.*, 591

F. Supp. 2d 150, 162 n.12 (N.D.N.Y. 2008)).

The courts within the Third Circuit use a two-step analysis in considering whether to certify

a case as a collective action under the FLSA. *See e.g. Aquilino v. The Home Depot, Inc.*, No. 04-

CV-4100, 2006 WL 2583563, at *1-2 (D.N.J. Sept. 7, 2006); *Pontius v. Delta Fin. Corp.*, No. 04-

1737, 2005 WL 6103189 (W.D. Pa. July 22, 2005); *Goldman v. RadioShack Corp.*, No. 2:03-CV-

0032, 2003 WL 21250571, at *6 (E.D. Pa. Apr. 16, 2003). "The first step is conducted early in

the litigation process, when the court has minimal evidence, and consists of a preliminary inquiry

into whether plaintiff's proposed class consists of similarly situated employees." *Harris v.*

*Healthcare Servs. Group, Inc.,* No. 06-2903, 2007 WL 2221411, at *2 (E.D. Pa. July 31, 2007)

(citations omitted); *see also Chabrier v. Wilmington Fin., Inc.*, No. 06-4176, 2008 WL 938872, at

*2 (E.D. Pa. Apr. 4, 2008). At this early stage, conditional certification is granted for the sole

purpose of giving notice and facilitating collective discovery. *Harris*, 2007 WL 2221411 at *2

(quoting *Bosley v. Chubb Corp.*, No. 04CV4598, 2005 WL 1334565, at *2 (E.D. Pa. June 3,

2005)). If a court grants conditional certification, then notice is given so that potential plaintiffs

have the opportunity to join the action. *Chabrier*, 2008 WL 938872, at *3; *De Asencio v. Tyson*

*Foods, Inc.*, 130 F. Supp. 2d 660, 662 (E.D. Pa. 2001). The second step, which is called the

decertification stage, is usually conducted at the close of class-related discovery, and it involves a

stricter analysis of whether the class is similarly situated. *See Harris,* 2007 WL 2221411 at *2

(citations omitted); *Woodard v. FedEx Freight East Inc.*, 250 F.R.D. 178, 191 (M.D. Pa. 2008)

(citing *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 497 (D.N.J. 2000)); *Aquilino,*

2006 WL 2583563, at *2.

"A court may conditionally certify the class for purpose of notice and discovery under a comparatively liberal standard, i.e., by determining that the members of the putative class 'were together the victims of a single decision, policy or plan.' " *Goldman*, 2003 WL 21250571, at *6 (citing *Mueller v. CBS, Inc.*, 201 F.R.D. 425, 428 (W.D. Pa. 2001)); *see also De Asencio*, 130 F. Supp. 2d at 663. Prospective plaintiffs need not be identical to satisfy this requirement. *Chabrier*, 2008 WL 938872, at *3; *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409 (W.D. Pa. 2000). "The standard here is 'fairly lenient', requiring a 'modest factual showing' that plaintiff is similarly situated to the proposed group." *Woodard*, 250 F.R.D. at 191 (quoting *Smith v. Sovereign Bancorp, Inc.*, No. Civ. A. 03-2420, 2003 WL 22701017, at *2-3 (E.D. Pa. Nov. 13, 2003)). "It should be stressed that this is an extremely lenient standard. Plaintiffs need only provide some 'modest' evidence, beyond pure speculation, that Defendant's alleged policy affected other employees." *Smith*, 2003 WL 22701017, at *3; see also *Harris*, 2007 WL 2221411 at *2; *Goldman*, 2003 WL 21250571, at *8 ("[C]onditional certification requires a lax showing of 'similarly situated.' "); *De Asencio*, 130 F. Supp. 2d at 663 (stating plaintiffs have a "fairly low burden"). This lenient standard typically results in conditional certification of a representative class. *Woodard*, 250 F.R.D. at 191; *Pontius*, 2005 WL 6103189 at *3; *Morisky*, 111 F. Supp. 2d at 497.

The lenient first-stage conditional certification analysis is the appropriate standard here. This case is in the early stages of litigation. The five (5) Plaintiffs here, by virtue of their own experience which is confirmed by Defendants' payroll records, easily establish a pattern of similarly situated employees. Moreover, Defendants recently provided over 40,000 pages of payroll records for the year of 2014-2016, which reflect that the company policy of failing to pay overtime pay was widespread. Thus, conditional certification should be granted.

IV.   **LEGAL ARGUMENT**

A.   **All Healthcare Workers Denied Overtime Pay by Defendants Are Similarly Situated for the Purpose of Conditional Certification.**

Plaintiffs easily meet their low burden through presenting evidence that they and Defendants' other Workers "were together the victims of a single decision, policy or plan," namely, Defendants' failure to pay overtime pay for hours worked in excess of forty in violation of the FLSA. Plaintiffs have presented to the Court, via exhibit to their Complaint, together with additional records attached hereto, the Declaration of Amy R. Brandt, and the Declarations of Plaintiffs confirming their allegations, evidence in support of this Motion. Further, Plaintiffs have presented: (1) additional payroll records for Plaintiffs (Exhibit "3"); (2) Exhibit "5", a summary of the spreadsheet analyzing the payroll records for 1261 of Defendants' employees from January 1, 2014- October 31, 2016, which establish Defendants' widespread failure to pay overtime and analyzing 1216 additional payroll records where Defendants manipulated Workers' wages to make it falsely appear as if they were being paid overtime. This evidence undoubtedly establish a pattern of Defendants' failure to pay any overtime to its Workers.

1.   **Workers Are All Victims of Defendants' Uniform Policy of Failing to Pay Overtime.**

Defendants did not pay any of the five (5) Plaintiff-Workers the overtime pay they were entitled to pursuant to the FLSA. Instead of paying overtime hours at a rate of one-and-one-half-times their regular rate of pay, Defendants only paid these Workers straight time. Plaintiffs believe that all Workers were and continue to be paid directly by Defendants using an hourly straight time rate for all hours they work at Defendants' Clients' homes or at a reduced rate adjusted to deprive them of overtime pay. This payment comes directly from Defendants, and not from the Client, in the form of a weekly paycheck. To get paid, all Workers engage in the same process. They all

14

submit weekly timesheets to Defendants for payment - in turn, Defendants issue payroll checks that do not include, and have never included, the overtime compensation, despite the numerous occasions that the Workers have worked in excess of 40 hours per week. (Exhibit "4", Plaintiffs' Initial Disclosures, see Timesheet samples Bates P-SBC-0012-17; P-SJ-0005-23)

### 2. Workers Need Only Show They Are Similarly Situated, Not Identically Situated, For Purposes of Conditional Certification.

Plaintiffs have easily met their lenient burden of showing that they are similarly situated to Defendants' other Workers. They are not required to show that they and all other Workers are identically situated. *See Chabrier*, 2008 WL 938872, at *3; *Moss*, 201 F.R.D. at 409. Defendants' common policy of failing to pay overtime to its Workers alone is enough to justify conditional certification of this action for the purpose of sending judicial notice and conducting collective discovery. Nonetheless, Defendants will surely focus on the difference between its W-2 employees and 1099 "independent contractors", in arguing that conditional certification is not appropriate. However, it is a distinction without difference since the 1099 Workers are all misclassified (they clearly meet the definition of "employee" as defined by the FLSA) and all have, similar to the W-2 Workers, been denied overtime pay. In any event, it is well-established that consideration of such purported "differences" is premature at the conditional certification stage. *Scott v. Heartland Home Fin., Inc.*, 2006 WL 1209813, at *3 (N.D. Ga. May 3, 2006) ("[V]ariations in specific job duties, job locations, working hours, or the availability of various defenses are example of factual issues that are not considered at this stage.")

Individualized inquiries are only appropriate, if ever, after collective discovery is complete. Conditional certification is the first stage in an FLSA action. It simply allows other Workers to receive notice of the action, permits them to join the action before their statute of limitations expire, and allows them to pool their resources by conducting collective discovery. The alternative is to

deny conditional certification, force Plaintiffs to re-file their claims separately, and bog down the courts and the parties with scheduling orders, discovery, and motion practice all relating to similar facts and issues that can be effectively managed here in one case.  In *Houston v. URS Corp.*, the defendant attempted to defeat certification of a class of "independent contractors," by alleging "differences" among the workers' "skill-level, efficiency, time worked, scheduling preferences or other [discretional] decisions . . . ." *Houston v. URS Corp.*, 591 F. Supp. 2d 827, 832-33 (E.D. Va. 2008).  The court ultimately rejected the defendant's arguments and certified the class, focusing on the fact that, despite these supposed differences, the defendant subjected all of the workers to the same uniform policies and practices. *Id.*  This Court should likewise reject any attempted assertions of variance among Workers because, similarly, all of the Workers (W-2 or 1099) are all subject to Defendants' uniform policy and practices of failing to pay overtime wages.[8]

After collective discovery, it is likely the Court can decide whether there is sufficient evidence to establish whether those 1099 Workers were misclassified as independent contractors. That determination, however, should be made after the parties have benefited from collective discovery, a uniform scheduling order, and consistent decisions regarding common legal questions, all in one cohesive forum.  Once significant discovery is complete, and the parties are at stage two of the FLSA process, the parties can reevaluate any such alleged difference between

---

[8] Furthermore, an analysis of factually similar substantive rulings reveals that these "differences" should not matter--even later after the conclusion of collective discovery. *See* e.g., *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1057 (2d Cir. 1988); *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 681 (1st Cir. 1998), *Wilson v. Guardian Angel Nursing, Inc.*, No. 3:07-0069, 2008 WL 4890589 (M.D. Tenn. Nov. 12, 2008) (denying defendant staffing-agency's motion to reconsider the court's previous grant of plaintiffs' motion for summary judgment and conditional certification, finding licensed practical nurses were "employees" and not "independent contractors.").

the W-2 and 1099 Workers who were both denied overtime pay and whether they even impact collective treatment of the case for trial.

**B.      Court Facilitated Judicial Notice is Appropriate.**

The Supreme Court holds that the collective action benefits to the judicial system "depend upon employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Hoffmann-La Roche*, 493 U.S. at 170.  District Courts are encouraged to become involved in the notice process early, to ensure "timely, accurate, and informative" notice and to help maintain control of the litigation. *Id.* at 171-72.  Court authorization of notice also serves the "legitimate goal of avoiding a multiplicity of duplicative suits." *Id.* at 172.  Short of providing an applicable standard, the Court in *Hoffmann-La Roche* established that a court-approved notice to potential plaintiffs in FLSA collective actions is proper in "appropriate cases." *Id.* at 169-70.

Judicial notice is appropriate here for several reasons. 'First, judicial notice will help preserve the claims of putative collective action members whose statutes of limitations continue to run. Unlike the statute of limitations for a putative class member in a Rule 23 class action, the statute of limitations for a putative collective action member is not tolled when the action is commenced. *See Redman v. U.S. W. Bus. Res., Inc.*, 153 F.3d 691, 695 (8th Cir. 1998); *Taylor*, 2009 WL 1324045, at *1 (quoting *Ruggles*, 591 F. Supp. 2d at 162 n.12).  Instead, the statute of limitations continues to run until the collective action member files his or her consent form. *Taylor*, 2009 WL 1324045, at *1.  In the FLSA context, judicial notice promotes the remedial purpose of Section 216(b) by preventing the erosion of claims due to the running of statutes of limitations.

17

Second, because the size of the putative collective class (Plaintiffs have alleged, upon information and belief that there are over 400 similarly situated Workers, and Defendants then advised that there are approximately 1,000, while the payroll records produced by Defendants reflect that there may be as many as 2983 employees), Plaintiffs and the Court cannot simply rely upon "word of mouth" or Plaintiffs' counsel's independent efforts to provide a fair method of providing timely, adequate notice of the lawsuit. Plaintiffs have sufficiently shown that others are interested in this action. Five Workers have joined so far. The rest of the putative collective class should be given this opportunity as well.

Third, sending judicial notice and allowing others to join in a single forum is appropriate because it will promote the significant judicial economies recognized in *Hoffmann-La Roche*, 493 U.S. at 170. Because nearly identical issues of law and fact exist between the Workers, moving forward with discovery as one action will benefit the judicial system. *See Hoffmann-La Roche,* 493 U.S. at 170. The alternative is filing numerous actions on behalf of the Workers possibly in different courts, resulting in disparate rulings and a waste of judicial and party resources. Here, given the fact that this case already includes five (5) Plaintiffs, it would not be an efficient economic method for the resolution of overtime claims if the Court were to bypass this opportunity to join these Workers together to resolve common questions of law and fact in one court at this early stage of litigation.

Finally, as required by *Hoffman-La Roche*, attached as Exhibit "6" is Plaintiffs' Proposed Notice and Consent Form. The Proposed Notice is "timely, accurate, and informative." *Id.* at 493 U.S. at 172. It is carefully drafted to mirror notice forms that other federal district courts have approved in previous similar cases. Plaintiffs also propose to send a Reminder Notice to ensure that those who wish to join the case do, can file a Consent Form before the deadline expires. *See*

*Loomis v. Cusa LLC*, 257 F.R.D. 674 (D. Minn. 2009) (granting request for conditional certification and notice, followed by a July 2009 order granting request for a reminder notice); *Oliver v. Aegis Commc'ns Group*, Inc., 2008 WL 7483891 (N.D. Tex., Oct. 30, 2008) (order granting conditional certification and allowing plaintiffs' counsel to send subsequent reminder notices during the notice period).  As such, the Proposed Notice achieves the ultimate goal of providing Workers accurate and timely notice concerning the pendency of the collective action.

V.  **CONCLUSION**

At this preliminary stage, Plaintiffs have come forward with the factual basis from which this Court can determine that similarly situated plaintiffs exist.  Defendants have denied them all overtime wages.  As such, Plaintiffs respectfully request that this Court follow the well-established precedent from the United States Supreme Court and 1) promptly authorize this case to proceed conditionally as a collective action; and 2) authorize and direct the mailing of the Proposed Notice and Consent Form to all potential plaintiffs at Defendants' sole cost.

Respectfully submitted,

WEIR & PARTNERS LLP

By: _____
Steven E. Angstreich
Carolyn C. Lindheim
Amy R. Brandt
Attorneys for Plaintiffs

Dated: March 20 , 2016.

19