# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NAKIA JACKSON, et al. | : | |
| | : | Civil Action No. 16-cv-02353-BMS |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| SWEET HOME HEALTHCARE | : | |
| LLC, et al. | : | |
| | : | |
| Defendants | : | |

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION PURSUANT TO RULE 23

---

On the Brief:

WEIR & PARTNERS LLP
By:     Steven E. Angstreich
        Carolyn C. Lindheim
        Amy R. Brandt
Suite 500
1339 Chestnut Street
Philadelphia, PA 19107
215-665-8181
215-665-8464 fax
sangstreich@weirpartners.com
clindheim@weirpartners.com
abrandt@weirpartners.com
Attorneys for Plaintiffs

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS..................................................................................... i

TABLE OF CITATIONS ................................................................................... ii

I.      PRELIMINARY STATEMENT .................................................................1

II.     SUMMARY OF RELEVANT FACTS .......................................................2

III.    APPLICABLE LEGAL STANDARD .........................................................9

        A.      This Litigation is Particularly Well-Suited for Class Treatment. ...............9

        B.      The Class Meets the Requirements of Rule 23(a) ....................................12

                1.      Numerosity.......................................................................12

                2.      Commonality.....................................................................13

                3.      Typicality .........................................................................15

                4.      Adequacy .........................................................................16

                        a.      Adequacy of Named Plaintiffs...........................................16

                        b.      Adequacy of Counsel.......................................................18

        C.      The Class Satisfies the Requirements of Rule 23(b)(3)...........................19

IV.     CONCLUSION...........................................................................................22

## TABLE OF CITATIONS

**Cases**                                                                                    **Page**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................17,19

*American Pipe & Construction, Co. v. Utah*, 414 U.S. 538 (1974) ...................................9

*Baby Neal ex rel Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994) ...............................15,16,17

*Beck v. Maximus, Inc.*, 457 F.3d 291 (3d Cir. 2006) ...............................................11,17

*Bunnion v. Consol. Rail Corp.*, No. 97-CV-4877, 1998 WL 372644, at \*3.....................11
  (E.D. Pa. May 14, 1998)

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .......................................................14

*Cannon v. Cherry Hill Toyota*, 184 F.R.D. 540 (D.N.J. 1999)..........................................17

*Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004) ...................................................11

*Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546 (1986)..........................................14

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)................................................11

*Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir. 1985)...............................................11,16

*Gen. Tel. Co. of the N.W. v. EEOC*, 446 U.S. 318 (1980) ..........................................12

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147........................................15
  102 S. Ct. 2364, L.Ed. 2d 740 (1982)

*Goldman v. Radioshack Corp.*, No. 03-CV-0032, 2005 U.S. Dist. LEXIS 8742, \*12......11
  (E.D. Pa. May 9, 2005)

*Gonzales v. Cassidy*, 474 F.2d 67 (5th Cir. 1973) .............................................17

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981).......................................................9

*Hayden v. Freightcar Am., Inc.*, No. 3:2007-21, 2008 WL 375762, at \*9 .......................11
  (W.D. Pa. Jan. 11, 2008)

*In re Cmty. Bank of N. Va.*, 418 F.3d 277 (3d Cir. 2005)..................................16

In re *DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011) ...................................20

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.* ...........................10
  55 F.3d 768 (3d Cir. 1995)

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2009).................11,12,20

*In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) ........................................21

*In re Prudential Ins. Co. Am. Sales Practices Litig.* ......................................13,16,17,18,21
  962 F.Supp. 450 (D.N.J. 1997), aff'd 148 F.3d 283 (3d Cir. 1998)

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585 (3d Cir. 2009)........................14

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)...............................21

*Lewis v. Ford Motor Co.*, No. 09-CV-164, 2009 WL 2750352, at *3.............................11
  (W.D. Pa. Aug. 25, 2009)

*Marcus v. BMW of North America*, 687 F.3d 583 (3d Cir. 2012) .....................12,14,16,20

*Panetta v. SAP Am., Inc.*, No. 05-CV-4511, 2006 WL 924996, at *1...............................10
  (E.D. Pa. Apr. 6, 2006)

*Ritti v. U-Haul Int'l, Inc.*, No. 05-CV-4182, 2006 WL 1117878, at *3 ...........................10
  (E.D. Pa. Apr. 26, 2006)

*Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1998)...............................................................15

*Seidman v. Am. Mobile Sys., Inc.*, 157 F.R.D. 354 (E.D. Pa. 1994) .................................16

*Stewart v. Abraham*, 275 F.3d 220 (3d Cir. 2001)............................................................12

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011)....................................................20

*Van Jackson v Check'N Go of Ill., Inc.*, 193 F.R.D. 544 (N.D. Ill. 2000)........................10

**Rules**

Fed. R. Civ. P. 23 .................................................................................11,14
Fed. R. Civ. P. 23(a) .............................................................11,12,13,15,16,19
Fed. R. Civ. P. 23(a)(1) ................................................................................12
Fed. R. Civ. P. 23(a)(2) ................................................................................13
Fed. R. Civ. P. 23(a)(3) ................................................................................20
Fed. R. Civ. P. 23(a)(4) .............................................................................17,19
Fed. R. Civ. P. 23(b) ....................................................................................12
Fed. R. Civ. P. 23(b)(3) .............................................................................19,20

**Statutes**

29 U.S.C. § 201 ............................................................................................1

43 Pa. St. Ann. § 333.104(c) ........................................................................1

Class Action Fairness Act of 2005, 109 P.L. 2 § 2(a)(1) (2005) ........................10

**Treatises**

7A Charles A. Wright, et al., Federal Practice and Procedure § 1751............................9,10
  (3d Ed. 2005)

Newberg on Class Actions Sec. 1:6 ...............................................................11
Newberg on Class Actions, Sec. 3.10 .............................................................14
Newberg on Class Actions, Sec. 3.22 .............................................................17

## I.      PRELIMINARY STATEMENT

This is a putative class action filed by Plaintiffs, Sarita Cave ("Cave"), Shatia Jackson ("S. Jackson"), Tina Williams ("Williams"), Lawrence Harris ("Harris") and Nakia Jackson ("N. Jackson")[1] on behalf of individuals who are or were employed by Defendants, Sweet Home Healthcare LLC ("Sweet Home Healthcare") and Sweet Home Primary LLC ("Sweet Home Primary") (collectively, "Sweet Home Defendants"), as Home Health Aides and Direct Care Workers to recover overtime compensation pursuant to the Pennsylvania Minimum Wage Act ("PMWA").[2] The PMWA requires that employees receive overtime compensation "not less than one and one-half times" the employee's regular rate of pay for all hours worked over 40 in a workweek.  43 P.S. §333.104(c).

Defendant Sweet Home Healthcare was established in May 2012 for the purpose of providing home health care services.  (Exhibit "1", Plaintiffs' Complaint at ¶18; Exhibit "2", Defendants' Answer)  Defendant, Sweet Home Primary is an alter ego of Sweet Home Healthcare. (Id. at ¶19)  The Sweet Home Defendants directly employ home health aides ("Home Health Aides") and direct care workers ("Direct Care Workers", collectively "Workers") to provide home care support and services to elderly and disabled clients such as medical assistance, companionship services, homemaking services and other home care services inside the clients' household.  (Id. at ¶20; Exhibit "2", Defendants' Answer)  The Sweet Home Defendants directly employ and pay hourly wages to the Workers, though Defendants misclassify some of those Workers as independent contractors and issue them a form 1099.  (Exhibit "1" at ¶¶21,25,28)  Nonetheless,

---

[1] N. Jackson is presently unavailable to participate as Class Representative and is not seeking to be so appointed.

[2] Plaintiffs also seek relief under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") for failing to pay overtime as required thereunder and sought conditional certification of a class pursuant to that Act by way of Motion, which Motion is presently pending before the Court.

pursuant to the relevant labor law's definitions, each of the Workers are "employees" of the Sweet Home Defendants and thus, are entitled to overtime pay for hours worked in excess of forty (40) per work week. (Id.)

To assert a right to overtime compensation, Plaintiffs filed this action on behalf of themselves and all similarly situated Workers, alleging, among other things, that Defendants, as their employers and their principals (Defendants Tekia Emerson and Darryl Ezell), wrongfully denied them and other Workers overtime compensation.  Plaintiffs now move for Rule 23 Class Action Certification as to their claims brought under Pennsylvania state law.  The proposed Class includes all persons who worked for Defendants as Home Health Aides or Direct Care Workers in Pennsylvania and were paid straight time with no overtime premium or were paid a reduced straight time with a reduced overtime premium when they worked more than 40 hours in one or more workweeks beginning on January 1, 2014 and ending through the present.

## II.    SUMMARY OF RELEVANT FACTS

The Sweet Home Defendants directly employ and pay hourly wages to the Workers. (Exhibit "1" at ¶¶20-21; Exhibit "2" at ¶21)  The Sweet Home Defendants are Medicare certified agencies.  A Medicare certification means that the agency has met federal minimum requirements for patient care and therefore Medicare and/or Medicaid will pay for covered home health services. (Exhibit "1" at ¶22)  The Workers are both Home Health Aides and Direct Care Workers.  The Home Health Aides are monitored by a registered nurse on a frequent basis and are required to have 75 hours of training prior to being assigned.  Defendants also provide Direct Care Workers to provide home care services, the only difference between the two is the level of training each aide has – that is, the direct care worker is only required to have 40 hours of training prior to assignment.  (Id. at ¶¶23-25) Defendants' payroll practices are uniform among the Home Health

Aides and Direct Care Workers.  Similarly, though Defendants misclassify some Workers as independent contractors, both are "employees" of the Sweet Home Defendants pursuant to the relevant labor law's definitions.  (Id. at ¶38)  The Sweet Home Defendants are required to be licensed and meet regulatory requirements; including, among other things, maintaining liability insurance, providing benefits and paying taxes for the Workers.  (Id. at ¶¶22,26)

Plaintiffs and the Class Members they propose to represent are Workers dispatched by Defendants to provide care to the Sweet Home Defendants' clients within the client's home. Plaintiffs and the Class Members are employed by the Sweet Home Defendants and do not have any direct or indirect employment relationship with the Defendants' Clients.  (Id. at ¶¶20,21,27,28) Plaintiffs and the Class Members frequently work in excess of 40 hours per workweek and, according to payroll records produced in discovery have worked hundreds of thousands of overtime hours since January 1, 2014.  (Id. at ¶30)  (Exhibit "3", Declaration of Amy R. Brandt, Esquire)  At all times since January 1, 2014, Defendants have uniformly refused to pay Plaintiffs and the Class Members the time and one half overtime premium for hours worked over 40 hours in a workweek.  (Exhibit "3" at ¶14)[3]  Instead, Defendants paid Plaintiffs and the Class Members their straight hourly wage for all hours worked, including overtime work.  (Exhibit "3") Defendants' failure to pay Plaintiffs and the Class Members the time and one half overtime premium for hours worked in excess of 40 hours in a workweek has resulted in Plaintiffs and the Class Members being significantly underpaid.  (Exhibit "1", Complaint at ¶31)

Plaintiff, Sarita Cave, became employed by the Sweet Home Defendants on March 25, 2015.  From approximately March 25, 2015 to December 2015, she provided services to the Sweet

---

[3] For a small group of workers, Defendants have manipulatcd thcir regular hourly rates to create the false appearance that overtime is being paid. (Exhibit "3", Declaration of Amy R. Brandt at ¶17)

Home Defendants' Clients in the Clients' households.  During that time, she was uniformly paid an hourly wage of $13.00 per hour.  However, she often worked over 40 hours per workweek.  For example, as indicated by the paystub attached as Exhibit "A" to Plaintiffs' Complaint, she was credited with working 50.75 hours during the one week period of March 30, 2015 and April 5, 2015, but was only paid the sum of $659.75 ($13.00 multiplied by 50.75 hours).[4]  Throughout her employment with the Sweet Home Defendants, Plaintiff Cave never received the time and one half overtime premium for hours worked over a 40 hour workweek.  Instead, she only received her straight hourly wage of $13.00 for overtime work.[5]  According to Defendants' payroll records, she was deprived of $641.50 for 71 hours of overtime pay.  (Exhibit "3", Declaration of Amy R. Brandt at ¶10)

Plaintiff Shatia Jackson became employed by the Sweet Home Defendants on October 15, 2014.  From approximately October 15, 2014 to approximately January 2016, she provided services to the Sweet Home Defendants' Clients in the Clients' households.  Upon her employment, she filled out a W-4 form as requested by Defendants and understood she would be an employee of the Sweet Home Defendants, although she was paid as a 1099 worker.  Shatia Jackson was initially paid $12.00 per hour and thereafter, $13.00 per hour as a 1099 worker.  However, she often worked over 40 hours per workweek.  For example, as indicated by the paystub attached as Exhibit "C" to Plaintiffs' Complaint, she was credited with working 84 hours during the one week period of January 4, 2016 and January 10, 2016 but was only paid the sum of $1,092

---

[4] Additional pay records for each Plaintiff are attached hereto as part of Plaintiff's Initial Disclosures (Exhibit "4") and reflect multiple work weeks during which each was deprived of overtime pay for work in excess of 40 hours.

[5] Declarations are additionally provided herewith by Plaintiffs Cave, Shatia Jackson, Lawrence Harris and Tina Williams which confirm the allegations set forth in the Complaint.  (Exhibit "5")

($13.00 multiplied by 84 hours). Throughout her employment with the Sweet Home Defendants, Shatia Jackson never received the time and one half overtime premium for hours worked over a 40 hour workweek. Instead, she only received her straight hourly wage of $13.00 for overtime work. According to Defendants' payroll records, she was deprived of $1,200.25 for 190.50 hours of overtime pay. (Exhibit "3", Declaration of Amy R. Brandt at ¶10)

Plaintiff Lawrence Harris became employed by the Sweet Home Defendants in the fall of 2014. In that capacity, he provided services to the Sweet Home Defendants' Clients in the Clients' households. Plaintiff Harris was uniformly paid an hourly wage of $12.00 per hour. Nonetheless, he regularly worked over 40 hours per workweek, and was paid interchangeably as a W-2 and 1099 worker. For example, as indicated by the paystub attached as Exhibit "D" to the Complaint, he was credited with working 83.50 hours during the one week period of May 22, 2015 and May 28, 2015 but was only paid the sum of $1,002.00 ($12.00 multiplied by 83.50 hours). Throughout most of his employment with the Sweet Home Defendants, Plaintiff Harris never received the time and one half overtime premium for hours worked over a 40 hour workweek. Instead, he only received his straight hourly wage of $12.00 for overtime work. Most recently, his hourly rate was reduced to create the false appearance that he is presently being compensated for overtime. According to Defendants' payroll records, he was deprived of $9,687.00 for 1,614.50 hours of overtime pay. (Exhibit "3", Declaration of Amy R. Brandt at ¶10)

Plaintiff Tina Williams became employed by the Sweet Home Defendants on October 15, 2014. Upon her employment, she filled out a W-4 form as requested by Defendants and understood she would be an employee of the Sweet Home Defendants, although she was paid as a 1099 worker. From approximately October 15, 2014 to December 2015, she provided services to the Sweet Home Defendants' Clients in the Clients' household. Plaintiff Williams was uniformly paid

5

an hourly wage of $13.00 per hour.  However, she regularly worked over 40 hours per workweek.

For example, as indicated by the paystub attached as Exhibit "E" to Plaintiffs' Complaint, she was

credited with working 101 hours during the one week period of December 21, 2015 and December

27, 2015, but was only paid the sum of $1,313.00 ($13.00 multiplied by 101 hours).  Throughout

her employment with the Sweet Home Defendants, Plaintiff Williams never received the time and

one half overtime premium for hours worked over a 40 hour workweek.  Instead, Williams only

received her straight hourly wage of $13.00 for overtime work.[6]  According to Defendants' payroll

records, she was deprived of $2,852.00 for 501.50 hours of overtime pay.  (Exhibit "3",

Declaration of Amy R. Brandt at ¶10)

On or about September 9, 2016, the parties exchanged their initial Disclosures.  On that

same date, Defendants produced documents, the majority of which were payroll records for the

year 2015 for approximately 900 employees. (Id. at ¶5) That production was incomplete as it did

not address the complete timeframe, however, it afforded Plaintiffs' counsel an opportunity to

analyze the wages paid to these employees.  (Id. at ¶6)  Those records revealed that the failure to

pay overtime was Defendants' regular practice.  (Id. at ¶7)

In or about November-December 2016, Defendants provided additional payroll records

purporting to be the complete records for Defendants' employees from January 1, 2014 through

October 31, 2016.  (Id. at ¶9)  Defendants also provided an employee list of 2983 workers and

employee records for 1,482 of them.  Unfortunately, this production was still deficient in light of

the records missing for 1501 employees.  (Id. at ¶12) Defendants contend that they no longer have

these records because they allegedly have been confiscated by the Pennsylvania Attorney

---

[6] Plaintiffs' Initial Disclosures are attached hereto as Exhibit "4".  They include additional pay records which demonstrate work weeks during which each named Plaintiff worked in excess of 40 hours without being compensated for overtime.  (Id. at ¶20)

General's Office in furtherance of an ongoing investigation.  (Id. at ¶13)  Thus, on March 7, 2017, Plaintiffs issued a subpoena to Wells Fargo Bank, N.A. ("Wells Fargo"), Defendants' payroll processing service, requesting the records for those 1501 employees.  It its first production of approximately 12,000 pages, only records for 30 of the employees whose records were missing were produced by Wells Fargo.  Plaintiffs are currently analyzing a second production made by Wells Fargo on May 12, 2017, to determine whether it contains the records for those employees.

Nonetheless, from the records that were produced, it is evident that there are at least 1261 employees who, like the proposed Class Plaintiffs, have been deprived of overtime pay from January 1, 2014 through October 31, 2016.  (Id. at ¶14)  Data from 18,258 payroll records on which it appeared that Defendants' employee was deprived overtime was entered on an Excel spreadsheet, representing 1261 distinct employee numbers (each employee is assigned a number, although on occasion a single employee may have been assigned two different numbers).  The spreadsheet was designed to calculate the amount of overtime which the employee should have been paid, but was not paid, revealing that Defendants failed to pay its employees approximately $1,785,817.31 in overtime pay.  (Id. at ¶¶15-16)

A second spreadsheet was created designed to capture workers who were actually paid overtime, but whose hourly rate had been manipulated by Defendants so that their weekly pay was not increased.  (Id. at ¶17)  For example, employee number 1709 had been earning $12 per hour. When he worked a week in excess of 40 hours, Defendants reduced his regular rate to make his weekly pay equivalent to his pay prior to paying overtime.  That is, prior to being paid overtime pay, he had been paid $12 per hour for a 45.5 hour work week, for a total of $546.00.  When Defendants paid him overtime, they adjusted his regular rate to $11.32 for the first 40 hours and paid an overtime rate of $16.98 so that his total weekly pay remained at $546 for the 45.5 hours

7

worked.  (Id. at ¶17)  The data from 1,216 payroll records were charted on the second spreadsheet. The underpaid overtime for these workers totaled $110,512.89.  (Id. at ¶18)

Thus, based on the records produced to date, there are approximately 1200 workers who, like the proposed Class Plaintiffs, were deprived of overtime pay; and the damages suffered by the Class is at least $1,896,330.20. Defendants' mistreatment of its workers *vis-à-vis* their failure to pay overtime pay is widespread and pervasive and the experiences of the four (4) proposed Class Representatives are representative of Defendants' employees as a whole for the time period of at least January 1, 2014 through October, 2016.  (Id. at ¶¶18-19)[7]

Finally, while Plaintiffs Cave and Harris were all classified by Defendants as W-2 employees, Plaintiffs S. Jackson, Williams, and at times Harris and several other persons hired by Defendants were classified by Defendants as if they were 1099 contractors, and compensated as such.  Thus, Plaintiffs Cave and Harris,[8] seek to represent themselves and a class of other Workers similarly situated (the "W-2 Class").  Plaintiff Williams and S. Jackson seek to represent themselves and the class of other 1099 Workers who were and are in fact employees under the applicable law and eligible for overtime under the PMWA (the "1099 Class").

Though Plaintiffs propose two separate subclasses, they intend to move for summary judgment to seek a ruling as to the misclassification of the 1099 Workers such that ultimately all of the Workers will be part of the same Class.  Thus, both the W-2 Class and 1099 Class will be referred to collectively as the "Class" or "Class Members".  Regardless of Defendants'

---

[7] In addition to failing to pay overtime, Defendants' recordkeeping and payroll practices are deficient.  While the January 1, 2014-October 31, 2016 records that have been produced are more than sufficient to establish a pattern of Defendants' failure to pay overtime, they also establish the deficiencies in Defendants' record-keeping.  (Id. at ¶19)

[8] Harris and other employees were classified both as a 1099 worker and a W-2 employee at different times, although their employment with Defendants never appear to have changed.

misclassification of some of its Workers, all of the Workers were similarly subjected to Defendants' practice failing to pay overtime.  Defendants' records identify at least 1261 distinct employee numbers associated with Workers who have been deprived overtime pay (and others who were underpaid because of the manipulated rates).  (Id. at ¶14)

In addition, Defendants required all of its Workers to follow the same uniform policies regarding time recordation and reporting and the payment of a straight hourly rate.  (Id. at ¶30) Defendants' Workers perform services needed by Defendants' Clients at the times and at locations the Workers are assigned by Defendants. (Id. at ¶¶20,27)  Defendants supervise the Workers throughout their assignments, typically through continuous communications with the Workers and the Clients.  (Id. at ¶27)  For this work, the Workers are then paid directly by Defendants' joint accounting department, according to Defendants' timesheets, and are subject to the same uniform policies.  (Id. at ¶¶30,43)  That is Defendants uniformly and consistently denied all Workers overtime compensation as required by the PMWA for hours worked in excess of 40 in a workweek. (Id. at ¶¶30,31)

## III.   APPLICABLE LEGAL STANDARD

### A.   This Litigation Is Particularly Well-Suited For Class Treatment.

Class actions serve three essential purposes: (1) facilitation of judicial economy by avoiding multiple suits on the same subject matter; (2) providing a feasible means for asserting the rights of persons who would have no realistic day in court if a class action was unavailable; and (3) deterring inconsistent results, assuring a uniform, singular determination of rights and liabilities. *American Pipe & Construction, Co. v. Utah,* 414 U.S. 538 (1974).  "[C]lass actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99 (1981); *see also, generally* 7A Charles A. Wright, et al., Federal Practice and Procedure § 1751

(3d Ed. 2005) ("Federal Practice and Procedure"). Both Congress and the courts have repeatedly recognized that "[c]lass action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties by allowing the claims to be aggregated into a single action against a defendant that has allegedly caused harm." Class Action Fairness Act of 2005, 109 P.L. 2 § 2(a)(1) (2005); *accord In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 783 (3d Cir. 1995). "Class actions provide those holding nominal claims with a cost-effective way of seeking redress: proving the claim of the class representative also proves the claim of every class member." *Ritti v. U-Haul Int'l, Inc.,* No. 05-CV-4182, 2006 WL 1117878, at *3 (E.D. Pa. Apr. 26, 2006) (*citing Panetta v. SAP Am., Inc.,* No. 05-CV-4511, 2006 WL 924996, at *1 (E.D. Pa. Apr. 6, 2006)). In the instant action, the claims asserted are relatively small when compared to the sophistication and resources of Defendants, and courts have recognized this disparity as evidence of the propriety of class certification. In this regard, one court's succinct observation when considering class certification of Truth-In-Lending Act claims before it is equally applicable here:

> This is precisely the kind of case that class actions were designed for, with small or statutory damages brought by impecunious plaintiffs who allege similar mistreatment by a comparatively powerful defendant, one that, if the facts alleged were proved, otherwise might get away with piecemeal highway robbery by committing many small violations that were not worth the time and effort of individual plaintiffs to redress or were beyond their ability or resources to remedy.

*Van Jackson v. Check'N Go of Ill., Inc.,* 193 F.R.D. 544, 547 (N.D. Ill. 2000). Benefits of class actions also include "the protection of the defendant from inconsistent obligations, the protection of the interests of absentees, the provision of a convenient and economical means for disposing of similar lawsuits, and the facilitation of the spreading of litigation costs among numerous litigants with similar claims." *In re Gen. Motors,* 55 F.3d at 783-84 (internal quotations omitted); *see also,*

*generally,* 1 Alba Conte & Herbert Newberg, Newberg on Class Actions § 1:6 (4th Ed. 2002) (*"Newberg"*).

Recognizing the benefits of class actions, the Third Circuit Court of Appeals "has adopted a liberal construction of Rule 23." *Bunnion v. Consol. Rail Corp.,* No. 97-CV-4877, 1998 WL 372644, at *3 (E.D. Pa. May 14, 1998) (*citing Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir. 1985)). District courts have "broad discretion" to determine class certification, *Goldman v. Radioshack Corp.,* No. 03-CV-0032, 2005 U.S. Dist. LEXIS 8742, *12 (E.D. Pa. May 9, 2005) and, "[f]or those cases in which there are doubts about whether a class should be certified, the question should be resolved in the movant's favor." *Lewis v. Ford Motor Co.,* No. 09-CV-164, 2009 WL 2750352, at *3 (W.D. Pa. Aug. 25, 2009) (*citing Eisenberg,* 766 F.2d at 785, *cert. denied,* 474 U.S. 946 (1985)).

Thus, although determining whether a plaintiff satisfies the prerequisites of certification requires a "rigorous analysis" of whether the requirements of Rule 23 (a) have been met, *see Beck v. Maximus, Inc.,* 457 F.3d 291, 297 (3d Cir. 2006), courts may not determine the merits of the plaintiff's case on a motion for class certification. *Hayden v. Freightcar Am., Inc.,* No. 3:2007-21, 2008 WL 375762, at *9 (W.D. Pa. Jan. 11, 2008) (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78 (1974) and *Chiang v. Veneman,* 385 F.3d 256, 262 (3d Cir. 2004)). As set forth below, Plaintiffs plainly meet the requirements of Rule 23 and, given the relative size of each putative Class Member's claim, certification of Plaintiffs' claims is unequivocally appropriate here.

In *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305 (3d Cir. 2009), the United States Court of Appeals for the Third Circuit defined the procedure that lower courts must follow in deciding class certification motions. A party seeking to certify a class action must meet the four requirements of Rule 23(a) which ensures the named plaintiffs are appropriate representatives of

the class whose claims they wish to litigate: (1) the class must be so numerous that joinder of all members is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims of the representative party must be typical of those of the class; and (4) the representative party must fairly and adequately protect the interests of the class.  A party who satisfies the Rule 23(a) prerequisites must then show that the putative class falls within one of the three categories set forth in Rule 23(b).  All requirements of Rule 23(a) must be demonstrated only by a preponderance of the evidence.  *See In re Hydrogen Peroxide Antitrust Litig., Id.*, 552 F.3d at 307.

**B.      The Class Meets the Requirements of Rule 23(a).**

     1.      <u>Numerosity.</u>

The first element of Rule 23(a) is numerosity.  Numerosity only requires that joinder be "impracticable." There is no strict number test for determining when the numerosity threshold is reached and the court is given discretion to make all reasonable assumptions when determining whether the numerosity requirement is met.  *See Marcus v. BMW of North America*, 687 F.3d 583, 595 (3d Cir. 2012):

> There is no minimum number of members needed for a suit to proceed as a class action.  See *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). We have observed, however, that "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  *Id.*  Nonetheless, Rule 23(a)(1) "requires examination of the specific facts of each case." *Gen. Tel. Co. of the N.W. v. EEOC*, 446 U.S. 318, 330 (1980)."

It is not required that the precise number of class members be known, but only that it be possible for the Court to ascertain and make findings of fact on the basis of the evidence presented. The Third Circuit Court stated:

> "Of course, Rule 23(a)(1) does not require a plaintiff to offer direct evidence of the exact number and identities of the class members. But in the absence of direct evidence, a plaintiff must show sufficient circumstantial evidence

> specific to the products, problems, parties, and geographic areas actually
> covered by the class definition to allow a district court to make a factual
> finding. Only then may the court rely on "common sense" to forgo precise
> calculations and exact numbers. See *In re Prudential Ins. Co. Am. Sales
> Practices Litig.*, 962 F. Supp. 450, 468, 510 (D.N.J. 1997), aff'd 148 F.3d
> 283 (3d Cir. 1998)."

*Id.* at 596.  Here, Defendants' records produced in discovery indicate that at least 1261 of its

Workers have been deprived overtime pay from January 1, 2014 through October 2016. The exact

identities of these Workers are proven by Defendants' payroll records.[9]  Obviously, this Class

exceeds the minimum number of 40 previously discussed by the Supreme Court.  Further,

Defendants identified additional Workers for whom they have yet to produce payroll records, but

to the extent that of a portion of these additional Workers are members of the Class (that is, they

too have been deprived overtime pay), it only goes to increase the number of potential Class

Member.  Clearly, the numerosity threshold has been met.

2. <u>Commonality.</u>

Commonality is the second threshold requirement under Rule 23(a).  Commonality is

present where "there are common questions of law or fact among the members of the class." Fed.

R. Civ. P. 23(a)(2).  The Supreme Court has stated class relief is especially appropriate when an

issue common to all class members may be litigated in an economical fashion by virtue of a class

action because the issue turns on a question of law equally applicable to all members of the class.

---

[9] Attached as Exhibit "6" [Bates numbers DEF013792-DEF013849] is a redacted version of what Defendants purport to be their employee list for the relevant time period.  This list identifies the name, address, employment status, caregiver class, Axis care number, hire date, termination date (where applicable), home phone, mobile phone and mailing/billing address for each.  Attached as Exhibit "7" is a redacted page from the spreadsheet prepared by Plaintiffs' counsel from the payroll records produced by Defendants with entries identifying the Workers who have been deprived overtime pay, together with the number of hours and amount of pay due.  The entire spreadsheet has not been attached due to its size and the fact that it contains what may be confidential information.

*Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979).  Rule 23 does not require denial of class certification merely because the claim of one or more of the class representatives arises in a factual context that varies somewhat from that of other plaintiffs.  *See Marcus*, 687 F.3d at 596 ("For purposes of Rule 23 (a)(2), even a single common question will do.")(citations omitted); *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009)"); *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1557 (1986) ("Rule 23 does not require that all the questions of law and fact raised by the dispute be common...  The claims actually litigated in the suit must simply be those fairly represented by the named plaintiffs.").  Indeed, "[w]hen the party opposing the class has engaged in some course of conduct that effects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected."  Newberg on Class Actions, Sec. 3.10, p. 3-51.

In the instant case, the claims of the Class Members are predicated on facts and law common to all Class Members.  The common issues include (1) whether the Class Members were entitled to overtime compensation for their hours worked; (2) whether they were similarly denied overtime compensation for their hours worked; (3) whether Defendants' policy of failing to pay overtime compensation violates the PMWA.

Pursuant to the PMWA, Plaintiffs need to prove that they are nonexempt employees of Defendants, that they at times worked in excess of 40 hours per week, and that Defendants failed to pay them overtime compensation.  Plaintiffs have established that with respect to the W-2 Class, there is no dispute as to the Worker's nonexempt status.  With respect to those Workers who were issued a 1099, the evidence uniformly shows that they were misclassified, and therefore, their nonexempt status is also a common issue among them.  The payroll records also uniformly show that at least 1261 of Defendants' Workers at times worked in excess of 40 hours per week (and

those that did not are not part of the putative Class). The payroll records uniformly show that Defendants failed to pay these Workers overtime compensation. Finally, as for damages, Defendants' records identify the hours worked in excess of 40 for each of its Workers, and thus, calculation of individual damages will use a common methodology of identifying the hours worked over 40 multiplied by one and one-half of the employee's hourly rate. Thus, Plaintiffs have shown that there are common issues of law and fact.

        3.    <u>Typicality.</u>

Rule 23(a)(3) requires that "typicality" between the claims of the class and that of the class representative be demonstrated. The requirement of typicality serves as a guidepost in determining whether the class representative's claims and those of the class itself are sufficiently interrelated so that the interests of the class members will be fairly and adequately protected in their absence. *See General Telephone Co. Of Southwest v. Falcon*, 457 U.S. 147, 156-157 n.13, 102 S. Ct. 2364, 2370, L.Ed. 2d 740 (1982). When it is alleged that the same unlawful conduct was directed at, or affected, both the named plaintiff and the class sought to be represented, the typicality requirement is met irrespective of varying fact patterns which underlie individual claims. *See Robidoux v. Celani*, 987 F.2d 931, 936-937 (2d Cir. 1998); *Baby Neal ex rel Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

Here, as is set forth above in detail, Defendants' course of conduct uniformly affected each of the named Plaintiffs and all of the members of the proposed W-2 Class and 1099 Class, in the same fashion; Defendants caused the same economic injury to the named Plaintiffs as they did to the members of the putative Class. The payroll records of each of the named Plaintiffs demonstrate that they were deprived of overtime pay, just as the payroll records of the absent Class members show that they were deprived of overtime pay. Thus, Plaintiffs have shown, by a preponderance

of the evidence, that their claims are typical of the Class.  All of the named Plaintiffs' claims arise from the same practice or course of conduct as the claims of the absent Class members.

Many courts, including the Third Circuit Court of Appeals, have held that "if the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of the factual differences." *In re Prudential Ins. Co. Sales Practices Litig.*, 148 F.R.D. 283, 310 (3d Cir. 1998).   The typicality requirement examines "whether the named plaintiff's individual circumstances are markedly different [from those of unnamed class members] or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg v. Gagnon*, 766 F.2d  at 786; *see also Baby Neal v. Casey*, 43 F.3d 48, 57-58 (3d Cir. 1994).  "The heart of this requirement is that the plaintiff and each member of the represented group have an interest in prevailing on similar legal claims." *Seidman v. Am. Mobile Sys., Inc.*, 157 F.R.D. 354, 360 (E.D. Pa. 1994).  "If a plaintiff's claim arises from the same event, practice or course of conduct that gives rise[] to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." *Marcus*, 687 F.3d at 598.  *See In re Cmty. Bank of N. Va.*, 418 F.3d 277, 303 (3d Cir. 2005) ("Cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims.").  Here, Plaintiffs clearly satisfy the typicality requirement.

    4.   <u>Adequacy.</u>

       a.   Adequacy of Named Plaintiffs.

The final requirement of Rule 23(a) is adequacy.  The Supreme Court has counseled that this element "serves to uncover conflicts of interest between named parties and the class they seek

to represent ..." and serves as a catch-all requirement that "tend[s] to merge with the commonality and typicality criteria of Rule 23(a)." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997); Newberg on Class Actions, Sec. 3.22, p. 3-126. The adequacy requirement involves a two-pronged inquiry: (1) it looks to whether the representative's interests are antagonistic to those of the Class; and (2) it considers whether the attorneys for the class representatives are capable of and qualified to represent the entire class. *Beck,* 457 F.3d at 296; *Baby Neal,* 43 F.3d at 55. Here, both prongs of the adequacy test are met. Defendants bear the burden of establishing inadequacy of the counsel or the representative. *See also Amchen Products, Inc. v. Windsor*, 521 U.S. 591, 626, n. 20 (1997). It is well-settled that a class representative is not required to have intimate knowledge of the legal basis of his claims, and may rely on the knowledge and experience of counsel. *Cannon v. Cherry Hill Toyota*, 184 F.R.D. 540 (D.N.J. 1999).

The adequacy requirement overlaps with the typicality requirement since the success of the class representative's claims determines the success of the other class members' claims. As a result, the vigorous prosecution of the class representative's claims will naturally benefit the other class members. Unless there exists some antagonism or conflict between the class representative and the class, adequacy is generally satisfied if the class representative's claims are typical. See *Gonzales v. Cassidy*, 474 F.2d 67, 72 (5th Cir. 1973); *Beck*, 457 F.3d at 291. The relevant question is whether the representatives' claims are so aligned with the claims of the class as to ensure that in prosecuting their own claims the representatives will protect the interests of the class. *See Amchem*, 521 U.S. at 625 ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent").

Plaintiffs here share the same incentives as absent class members to establish the allegations that Defendants' conduct violated Pennsylvania wage law. *See In re Prudential Ins.*

17

*Co. Am. Sales Practice Litig.*, 148 F.3d at 313. Moreover, Plaintiffs have demonstrated that they are ready, willing, and able to fulfill their duties as class representatives. To date, Plaintiffs have brought their claims to counsel and thereafter, assisted in reviewing the pleadings, providing supporting documents and information for their informal disclosures, providing information for their Affidavits in support of the Motion for Conditional Class Certification, and answering discovery requests, including requests for the production of documents and interrogatories. They have also spent substantial time in helping counsel to prosecute this action. Furthermore, despite the fact that Defendants have yet to notice their depositions, Plaintiffs Shatia Jackson, Williams and Harris have provided dates of June 7, 8 and 12, respectively, and are ready and willing to proceed with same. Plaintiffs have worked to advance the interests of the Class, and each Class Member is likely to benefit from this litigation.

In sum, Plaintiffs' interests are aligned with the interests of the absent Class Members, and there is no potential danger of a conflict. Plaintiffs were all Defendants' employees during the Class Period. During the Class Period, Plaintiffs suffered an injury in fact as a result of Defendants' violations of the PMWA. Hence, like other members of the Class, Plaintiffs have an interest in demonstrating Defendants' violations. No conflict at all exists here, let alone one that goes to the subject matter of the case.

b.      Adequacy of Counsel.

The attorney competence prong involves issues of whether representatives' counsel are qualified, experienced, and generally able to conduct the proposed litigation. Plaintiffs have retained qualified, experienced attorneys with broad-based, multi-jurisdictional experience in complex class action litigation. The law firm has, and will continue to, vigorously prosecute this action on behalf of the Class. Evincing the adequacy of counsel, the firm investigated the

violations alleged by Plaintiffs and filed a comprehensive complaint.  Further, the firm has propounded discovery requests and has reviewed over 15,000 pages of wage records produced by Defendants (with over 40,000 wage entries) to determine the scope of the Class.  Counsel prepared a preliminary analysis to determine the scope of the Class revealing at least 1261 employees, as well as the scope of the damages (in excess of $1.8 million) for those Workers.  Plaintiffs have additionally aggressively pursued the remaining wage records of Defendants, which Defendants contend have been confiscated by the Pennsylvania Attorney General's Office in an effort to further determine the members of the class and their damages.  In addition, the firm successfully defended Defendants' Motion to Dismiss Plaintiffs' Complaint, and has filed Plaintiffs' Motion for Conditional Certification of their FLSA claims, which Motion is presently pending before the Court.  A full description of the class action experience of the members of the firm who are participating in this matter is attached hereto as Exhibit "8".

Given the qualifications of Plaintiffs' counsel and the absence of any conflict between Plaintiffs and the Class, Plaintiffs clearly satisfy the requirements of Rule 23(a)(4).

**C.     The Class Satisfies the Requirements of Rule 23(b)(3).**

In addition to satisfying Rule 23(a), the proposed class satisfies the requirements of Rule 23(b)(3), which requires that: (1) common issues of law and fact predominate over questions affecting only individual class members," and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  The Third Circuit Court has held that, "[u]nder Rule 23(b)(3), 'questions of law or fact common to the class members [must] predominate over any questions affecting only individual members.'  This predominance requirement 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. at 623.  To assess

predominance, a court at the certification stage must examine each element of a legal claim 'through the prism' of Rule 23(b)(3).  *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630 (3d Cir. 2011). A plaintiff must demonstrate that the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members."  *Hydrogen Peroxide* 552 F.3d at 311; *Marcus v. BMW of North America*, 687 F.3d at 600.  "The Rule 23(b)(3) predominance inquiry" -- requiring that common issues predominate over individualized ones -- "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation [.]'" *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) quoting *Amchem Prods. Inc. v. Windsor*, 521 U.S. at 623.  The Third Circuit Court precedent demonstrates that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan*, *supra* at 298.

The predominance inquiry also "assesses whether a class action 'would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated[.]'" *Sullivan*, *supra* at 297 (quoting advisory committee's note to 1966 amendment).  With regard to whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

There is little doubt a class action would serve the interests of the Class Members in the instant case.  Absent class certification, many potential claimants might not become aware that they were entitled to seek their unpaid overtime.  Second, individual litigation of each of the Workers' claims would be highly inefficient and impracticable since the cost of individual litigation may exceed the individual recovery for many of the potential class members.

The "unlawfulness of [the defendant's] conduct..." is an issue "common to the entire class and which predominate[s] over any issues related to individual class members." *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (alleging defendant "engaged in a broad-based campaign, in violation of federal and state consumer fraud and antitrust laws, to deceive consumers"); *see also*, e.g., *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162 (3d Cir. 2002) ("[C]ommon issues... predominate here because the inquiry necessarily focuses on defendants' conduct, that is, what defendants did rather than what plaintiffs did."); *In re Prudential Ins. Co. Am. Sales Practice Litigation*, 148 F.3d 283, 313-14 (3d Cir. 1998) (affirming district court finding of predominance where class members alleged "a common scheme").

Finally, this Court has regularly held that class actions are the appropriate vehicle to remedy PMWA overtime claims either by certifying a class under Rule 23 or approving a settlement class such as in:

- *Young v. TriCounty Security Agency, Inc.*, 2:13-cv-05971, May 17, 2014, EDPA Hon. Berle M. Schiller (Court certified PMWA class and FLSA collective action and approved settlement for security guards employed by defendants who were denied overtime compensation);
- *Thomas v. Cescaphe Limited, LLC,* 2:11-cv-04359, October 3, 2012, EDPA, Hon. Berle M. Schiller (Court approved settlement agreement pursuant to Rule 23(e) for matter involving overtime pay to hourly food service employees);
- *Drummond v. Herr Foods, Inc.*, 2:13-cv-05991, September 9, 2016, Hon. Berle M. Schiller (Court approved settlement and for purposes therefore, certified Rule 23 Class of route salespeople);
- *Rivera v. Vital Support Home Health Care Agency, Inc.*, 2:2015cv2015, August 13, 2016, EDPA, Hon. Gene E.K.Pratter (Court approved settlement class of home health aides against agency for failing to pay overtime);
- *Leap v. Yoshida et al.,* 2:2014cv03650, Hon. Gene E.K. Pratter (Court approved class and collective action settlement for denial of overtime compensation).

Thus, it is clear that in this action seeking the recovery of unpaid overtime, common issues of law and fact predominate and a class action is superior to other available methods.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court certify a class defined as:  all persons who worked for Defendants as Home Health Aides or Direct Care Workers in Pennsylvania from January 1, 2014 to the present and were paid straight time with no overtime premium or were paid a reduced straight time with a reduced overtime premium when they worked more than 40 hours in one or more workweek.  Further, Plaintiffs respectfully request that they be appointed as class representatives and that undersigned counsel be appointed class counsel.

Respectfully submitted,

WEIR & PARTNERS LLP

By:  /s/ Steven E. Angstreich
         Steven E. Angstreich
         Carolyn C. Lindheim
         Amy R. Brandt
         Attorneys for Plaintiffs

Dated:  May 31, 2017.