**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TINA WILLIAMS, et al.,** | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **SWEET HOME** | : | |
| **HEALTHCARE, LLC, et al.,** | : | **No. 16-2353** |
| **Defendants.** | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                               **January 31, 2018**

Lawrence Harris and Tina Williams brought this putative class action lawsuit against Sweet Home Healthcare, LLC and Sweet Home Primary Care, LLC (collectively, "Sweet Home" or the "company"), alleging violations of the Fair Labor Standards Act (FLSA) and the Pennsylvania Minimum Wage Act (PMWA). Harris and Williams purport to represent a class of current and former Sweet Home healthcare workers who allegedly worked overtime and were denied proper compensation. Plaintiffs moved for certification of a Rule 23 class action on their PMWA claim and conditional certification of a FLSA collective action. For the reasons discussed below, the Court will certify a Rule 23 class action and will grant conditional certification of a FLSA collective action. The Court will also deny Sweet Home's motion to strike the declaration of Amy Brandt.

## I.       BACKGROUND

Sweet Home Healthcare and Sweet Home Primary Care are home healthcare agencies. They employ home healthcare workers who provide in-home support to elderly and disabled individuals ("consumers"). (Defs.' Mem. of Law in Opp. to Pls.' Mot. for Class Cert. [Defs.' Resp.] at 2.) Harris and Williams both worked for Sweet Home as home healthcare workers. (*Id.*

at 1.) They seek to represent a class of home healthcare workers who worked at Sweet Home and logged overtime hours between January 1, 2014 and the present. (*Id.* at 1–2.) Plaintiffs claim that Sweet Home failed to properly compensate the putative class members for these overtime hours as required by the FLSA and PMWA. (Compl. ¶ 30.)

Sweet Home operates in a heavily regulated home healthcare system. (Pls.' Mem. of Law in Supp. of Mot. for Class Cert. [Pls.' Class Cert. Br.] at 3.) A Pennsylvania agency approves consumers for the services provided by Sweet Home. (Pls.' Reply Br. in Supp. of Mot. for Class Cert. [Pls.' Reply] at 3.) For each of Sweet Home's consumers, the state agency provides the company with a service authorization form, which sets the number of hours per week the consumer is entitled to assistance, as well as the specific services to be provided to the consumer. (*Id.*) The agency reimburses Sweet Home for at least some of the hours worked by each home health worker. (*Id.* at 6.) The reimbursement is based on the workers' timesheets, which Sweet Home verifies and submits to the state agency. (*Id.*)

Sweet Home has two groups of home healthcare workers: "home health aides" ("HHAs") and "direct care workers" ("DCWs"). (Pls.' Class Cert. Br. at 1–2.) The proposed class consists of both of these groups. The distinction between the two appears to be largely based on the degree of government regulation and Sweet Home's different hiring, training, and oversight procedures for each group. According to Sweet Home, only HHAs are required by Pennsylvania regulations to receive at least 75 hours of training and be certified. (Defs.' Resp. at 2.) Sweet Home also notes that it imposes different competency and supervision requirements for HHAs and DCWs. (Defs.' Sur-Reply at 14.) However, there are few apparent differences in the actual work done by HHAs and DCWs. Both personnel groups work with consumers in their homes, providing similar services, including medical assistance, companionship, and homemaking. (Pls.'

Class Cert. Br. at 1; Defs.' Resp. Exs. 1 [Person Decl.] ¶ 12 and 2 [Ervin Decl.] ¶ 10.) The services provided by both groups are based on the state-issued service authorization forms. (Pls.' Reply at 3.) Moreover, all of the workers are paid hourly wages. (Pls.' Class Cert. Br. at 2.)

In addition to distinguishing between HHAs and DCWs, Sweet Home classified some of its home healthcare workers as employees and others as independent contractors. (*Id.*) This distinction has potentially significant consequences for Plaintiffs' case, because only employees—not independent contractors—are entitled to overtime pay under the FLSA and the PMWA.

Plaintiffs—and the evidence cited—suggest that Sweet Home's classification of workers during the relevant time period was largely arbitrary and at times inconsistent. For instance, one of Sweet Home's corporate designees testified that whether a new worker was classified as an employee or an independent contractor depended simply on which tax form the worker filled out upon being hired. (Pls.' Reply at 5–6 n.2.) Sweet Home's other corporate designee testified that Sweet Home allowed workers to change their classification upon request, apparently without any actual change in the working relationship. (Pls.' Reply Ex. D [Person Dep.] at 48–49.) And even after the company began classifying all new HHAs and DCWs as employees, it allowed certain existing workers classified as independent contractors to request to keep that classification. (*Id.* at 53.)

In addition, Plaintiffs claim that Sweet Home did not adhere to its own classifications. They note that Williams filled out a W-4 ("Employee's Withholding Allowance Certificate") form but was paid as an independent contractor. (Pls.' Reply at 5–6 n.2.) Harris, meanwhile, was paid as an employee at times and as an independent contractor at others; on some occasions he was paid as both simultaneously. (Defs.' Resp. at 26.)

3

Regardless, Harris and Williams argue that Sweet Home's classification of certain workers as independent contractors was improper. They claim that they and all other HHAs and DCWs in the proposed class—at least 1,261 workers—were "employees" as a matter of law under the FLSA and the PMWA. (Pls.' Class Cert. Br. at 1–2.) Therefore, they claim that all of the putative class members should have been paid at the overtime rate for the overtime hours they recorded. (*Id.*) In total, Plaintiffs claim the workers were underpaid for hundreds of thousands of hours of overtime. (*Id.* at 3.)

Plaintiffs allege two distinct Sweet Home policies that both effectively denied the putative class members overtime pay. First, Plaintiffs claim that Sweet Home regularly failed to apply the 1.5 multiplier to its home healthcare workers' overtime hours. (Pls.' Reply at 7.)

Second, around July of 2016, Sweet Home established a new overtime policy. (Pls.' Reply at 7 n.4; Ex. C [E. Williams Dep.] 46–51.) Under the policy, Sweet Home adjusted its home healthcare employees' regular hourly wages each week based on the number of overtime hours they were expected to work. (E. Williams Dep. at 46–51.) It then applied a 1.5 multiplier to the overtime hours. (Person Dep. at 60.) The purpose of this policy was to pay the employees the same weekly totals they received prior to this policy change by reducing their regular rate before applying the overtime multiplier. (E. Williams Dep. at 51.) In other words, Sweet Home's new policy was to pay its employees at the overtime rate in form, but pay them a straight hourly rate in substance. Harris alleges that he was affected by this wage manipulation policy; Williams was no longer working for Sweet Home when it took effect. (Pls.' Class Cert. Br. at 5–6.)

Plaintiffs sued Sweet Home under the overtime provisions of both the FLSA and the PMWA. They subsequently filed a motion to conditionally certify a FLSA collective action.

They also moved for certification of a class action under Rule 23(b)(3). Plaintiffs propose the following class definition for the Rule 23 class action:

> [A]ll persons who worked for Defendants as Home Health Aides or Direct Care Workers in Pennsylvania from January 1, 2014 to the present and were paid straight time with no overtime premium or were paid a reduced straight time with a reduced overtime premium when they worked more than 40 hours in one or more workweek[s].

(Pls.' Class Cert. Br. at 22.)

In addition to Plaintiffs' motions, before the Court is Sweet Home's motion to strike a declaration submitted by Plaintiffs' counsel, Amy Brandt, in support of their certification motions.

## II.   CLASS CERTIFICATION

In order to certify a class action, a court must find that the four requirements of Rule 23(a) are met. Rule 23(a) allows class certification only if:

1) the class is so numerous that joinder of all members is impracticable;
2) there are questions of law or fact common to the class;[1]
3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
4) the representative parties will fairly and adequately protect the interests of the class.

In addition, because Plaintiffs seek to certify a class action under Rule 23(b)(3), they must also satisfy the additional requirements of that subsection. Rule 23(b)(3) requires that "(i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)." *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010). The Third Circuit also recognizes an implicit requirement that plaintiffs seeking

---

[1] Commonality is treated as subsumed by the "predominance" requirement of Rule 23(b)(3). *See infra* § II.C.2.

certification of a Rule 23(b)(3) class demonstrate that the class is ascertainable. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012).

"Class certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008) (internal quotation marks omitted). The court must find by a preponderance of evidence that the plaintiffs meet each of the Rule 23(a) and Rule 23(b)(3) requirements. *Id.* at 320.

**A.      Class Definition**

Rule 23(c)(5) allows courts to divide a class into subclasses "[w]hen appropriate." Subclasses are appropriate "where a class is found to include subclasses divergent in interest." *In re Ins. Brokerage Litig.*, 579 F.3d 241, 271 (3d Cir. 2009). District courts have discretion to determine whether or not to create subclasses. *Id.* This case raises two potential subclass issues, discussed below.

*1.      Plaintiffs' proposed subclasses*

Plaintiffs have proposed dividing the class into two subclasses, one comprised of workers who were classified by Sweet Home as employees and another comprised of workers classified as independent contractors. (Pls.' Class Cert. Br. at 8.) However, the Court is not convinced this approach—which Plaintiffs only briefly address—is correct. First, subclasses are treated as separate classes under Rule 23, *see McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 474 (E.D. Pa. 2009), but the parties have briefed the issues as if only one class exists. Second, Plaintiffs themselves argue that all of the home healthcare workers were employees under the PMWA. They expect the Court to "merge" the subclasses if they succeed on a summary judgment motion on this issue. (*See* Pls.' Reply at 6 n.3.) But because the class members will all

need to prove that they were employees under the PMWA, the Court does not find divergent interests between the two proposed subclasses. Moreover, because of the lack of distinguishing factors presented by either party, and in light of the apparently arbitrary nature of Sweet Home's classifications, the Court finds that the analysis for both groups will be similar, if not identical.

For these reasons, the Court declines to create subclasses based on employee/ independent contractor status as proposed by Plaintiffs.

### 2. *Plaintiffs' two theories of unpaid overtime*

A closer question is whether subclasses are necessary with regard to: a) the group of workers who were paid at their regularly hourly rate for the overtime hours they recorded (the "unpaid overtime" class members); and b) the workers who were paid overtime but whose hourly wages were manipulated (the "wage manipulation" class members). Plaintiffs seek to include both of these groups in one class.

Plaintiffs do not acknowledge that these two groups will rely on slightly different legal theories. As discussed below, both groups will be required to prove that they were employees under the PMWA and that they worked overtime. *See infra* § II.C.2. At this point in the analysis, however, the two groups' legal theories will diverge slightly. The "unpaid overtime" class members must prove only that they were not paid at 1.5 times their regular rate for overtime hours to succeed on their claim. The "wage manipulation" class members, on the other hand, must prove that Sweet Home manipulated their wages and that this practice was unlawful. *Compare Watkins v. Hudson Coal Co.*, 151 F.2d 311, 319 (3d Cir. 1945) (holding that an employer's overtime formula "must not be a mere mathematical cloak under which to continue the same payment practices as hitherto") *with Walling v. A.H. Belo Corp.*, 316 U.S. 624, 630 (1942) (explaining that the FLSA—which largely parallels the PMWA—does not bar "an

employer from contracting with his employees to pay them the same wages that they received [without overtime pay], so long as the new [overtime] rate equals or exceeds the minimum required by the [FLSA]").

Despite these differences in legal theories, subclasses are unnecessary. "A class need not be divided into subclasses merely because different groups have alternative legal theories for recovery, or because those groups have different factual bases for relief." *In re Ins. Brokerage Antitrust Litig.*, Civ. No. 04-5184, 2007 WL 542227, at *17 (D.N.J. Feb. 16, 2007). So long as the class members do not have divergent interests that would create conflicts of interest, the class can proceed without subdivision. *See Ins. Brokerage Litig.*, 579 F.3d at 271.

The only difference in legal theories here is that the "wage manipulation" workers will have to establish that Sweet Home's policy of manipulating wages was unlawful under the PMWA. In substance, however, Plaintiffs' claims are the same: that Sweet Home unlawfully denied overtime pay to its home healthcare workers. Thus, the Court does not find that the class members have divergent interests that would require subclasses.

### B.    Rule 23(a) Requirements

#### 1.    *Numerosity*

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Plaintiffs bear the burden of showing "that there are *in fact* sufficiently numerous parties." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 357 (3d Cir. 2013). Plaintiffs may rely on either direct or circumstantial evidence to do so, and need not pinpoint an exact number of class members. *Marcus*, 687 F.3d at 596. While there is no minimum number of plaintiffs required, if the "potential number of plaintiffs exceeds 40," the requirement is typically satisfied. *Marcus*, 687 F.3d at 595.

The numerosity requirement has been satisfied. Plaintiffs, relying on Sweet Home's payroll records, claim that at least 1,261 workers were improperly denied overtime pay. (Pls.' Class Cert. Br. at 13.) Plaintiffs base this number on an analysis of Sweet Home's payroll data presented by their counsel, Amy Brandt. (*See* Pls.' Class Cert. Br. Ex. 3 [Brandt Decl.].) Given this high number of class members, the Court finds that joinder would be impracticable. Thus, Plaintiffs have satisfied the numerosity requirement.

2.    *Typicality*

The typicality requirement of Rule 23(a)(3) ensures that the named plaintiff's claims and those of the class are sufficiently interrelated that their interests will be aligned. *Beck v. Maximus, Inc.*, 457 F.3d 291, 295–96 (3d Cir. 2006). The requirement is "intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996). When the named plaintiffs challenge the same unlawful conduct that affects the putative class, the requirement is usually met "irrespective of the varying fact patterns underlying the individual claims." *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994).

Here, the typicality requirement is clearly met. Plaintiffs challenge Sweet Home's uniform failure to pay its home healthcare workers the proper overtime rate. Both Harris and Williams and over a thousand putative class members were allegedly harmed by Sweet Home's initial policy of not paying overtime. In addition, Harris alleges that he and certain class members were harmed by Sweet Home's wage manipulation policy. All of these claims are interrelated and will rely largely on the same legal theory: that the workers were employees under the PMWA and were therefore entitled to the overtime pay rate for the overtime hours they

9

worked. The individual facts of each worker's activities and experiences do not destroy typicality. *See id.* Harris' and Williams' interests are aligned with those of the proposed class.

Sweet Home argues that the typicality requirement is not met because Harris and Williams may be subject to unique defenses. Unique defenses are relevant to typicality because of the danger that the representative will become preoccupied with such defenses, thereby disadvantaging the class. *Maximus*, 457 F.3d at 296–97. The defendant carries the burden of showing "some degree of likelihood a unique defense will play a significant role at trial. If a court determines an asserted unique defense has no merit, the defense will not preclude class certification." *Id.* at 300.

Sweet Home claims that Harris and Williams will be subject to unique defenses related to the veracity of their timesheets. (*See* Defs.' Resp. at 24.) However, while the veracity of the Named Plaintiffs' timesheets may impact their damages, it will not be a defense to liability. Sweet Home cannot rely on the alleged inaccuracies in its workers' timesheets to show that they did not work overtime for three reasons. First, Sweet Home does not claim that the Named Plaintiffs never worked overtime, nor would it be likely to succeed in arguing this, since Harris' service authorization form shows that his consumer was approved for more than 40 hours of assistance per week. (*See* Pls.' Reply Ex. L.) Second, as discussed below in the predominance analysis, Sweet Home has a duty under the PMWA to maintain an accurate record of the hours worked by each of its employees; it cannot ignore that duty and subsequently avoid all liability based on its employees' hours recorded. *See infra* § II.C.2.a.[2] Finally, Sweet Home approved

---

[2] To be clear, the PMWA record-keeping duty only applies for employees. However, a key aspect of Plaintiffs' case is the claim that all of the class members were employees as a matter of law, regardless of Sweet Home's classification of some as independent contractors. If the Court finds that the workers were employees, the record-keeping provision will apply. If not, Plaintiffs will simply not have a PMWA overtime claim, thereby mooting this defense.

these timesheets, paid Plaintiffs for the time recorded, and submitted the "verified" records to a state agency for reimbursement. *See id.* Thus, the Court does not find that this defense will destroy typicality.

       *3.     Adequacy of representation*

       *a.     Harris and Williams are adequate class representatives.*

"The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 393 (3d Cir. 2015). The inquiry therefore focuses primarily on whether the class representatives have conflicts of interest with the putative class members; it does not require that the representatives possess more than "a minimal degree of knowledge necessary to meet the adequacy standard." *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007). Moreover, only a "fundamental" conflict of interest will be sufficient to impact the adequacy analysis. *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012). "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Id.* (internal quotation marks omitted).

Harris and Williams are adequate representatives. They possess the "minimal degree of knowledge" necessary to represent other class members. They have participated in the proceedings, working with their counsel throughout the process and attending depositions. Moreover, Sweet Home has not raised any issues that suggest a fundamental conflict of interest between Harris and Williams and the class members. Both Harris and Williams and the class as a whole were allegedly harmed by Sweet Home's refusal or failure to pay the overtime rate; none of the putative class members allegedly benefitted from this conduct.

Sweet Home offers several arguments as to why Harris and Williams are not adequate representatives. First, it again raises a "unique defense" argument, which is relevant to the adequacy inquiry. *See Beck*, 457 F.3d at 296. It argues that inconsistencies regarding Harris' and Williams' classifications as employees or independent contractors preclude a finding that they can adequately represent a class of workers including those classified as either employees or independent contractors. (Defs.' Resp. at 26.)

Remarkably, Sweet Home points to its own payroll practices to support this argument. It notes that it classified Harris at times as an employee and at other times as an independent contractor. (*Id.*) On multiple occasions, Sweet Home paid Harris overlapping paychecks as both an employee and an independent contractor during the same pay period. (*Id.*) Williams, as Plaintiffs acknowledge, filled out an employee tax form when she began working for Sweet Home, yet Sweet Home's paychecks identified her as an independent contractor, and it did not deduct income taxes from her wages. (Pls.' Class Cert. Br. at 5.) Sweet Home argues that these discrepancies would open Harris and Williams up to unique defenses under the PMWA's economic reality test, prejudicing the class members. (Defs.' Resp. at 26.)

Rather than support Sweet Home, these inconsistent and apparently arbitrary classifications actually support Plaintiffs' assertions regarding the company's common practices. As noted, Sweet Home's corporate designee testified that Sweet Home commonly applied the very types of arbitrary classifications it claims raise a unique defense with regard to Harris and Williams. (Person Dep. at 48–53.) Thus, whatever "defense" these issues may provide Sweet Home, it does not appear to be unique to the Named Plaintiffs. Moreover, Sweet Home's classification of certain home healthcare workers as independent contractors would not be a complete defense under the economic reality test because the test does not simply accept the

employer's classification of its workers. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947) (explaining that where a worker appears to be an employee, "putting on an 'independent contractor' label does not take the worker from the protection of the [FLSA]"); *Safarian v. Am. DG Energy Inc.*, 622 F. App'x 149, 152 (3d Cir. 2015) ("This [FLSA] inquiry is not governed by the 'label' put on the relationship by the parties . . . .") (citation omitted).

Sweet Home also argues that Harris and Williams cannot represent a class including DCWs because both claim they were HHAs. (Defs.' Resp. at 27.) This argument is disingenuous. Sweet Home itself admits that its "employee list labels Harris as a DCW." (Defs.' Sur-Reply at 15; *see also* Pls.' Reply Ex. 6 [Worker List].) Harris' *actual* position, not his position as he understands it, is what is relevant to whether he can represent class members in a similar position.

Finally, Sweet Home argues that Harris and Williams are inadequate representatives because they lack credibility. (Defs.' Resp. at 27–29.) In support, it points to inconsistent testimony and allegedly falsified timesheets from both Named Plaintiffs.

The credibility of the named plaintiff is relevant to the adequacy requirement. *Dotson v. Portfolio Recovery Assocs., LLC*, Civ. A. No. 08-3744, 2009 WL 1559813, at *2 (E.D. Pa. June 3, 2009). However, only significant credibility concerns that "go to the heart of the claims or defenses" at issue in the case will create a risk of inadequate representation. *Sherman v. Am. Eagle Exp., Inc.*, Civ. A. No. 09-575, 2012 WL 748400, at *7 (E.D. Pa. Mar. 8, 2012); *see also Coyle v. Hornell Brewing Co.*, Civ. A. No. 08-2797, 2011 WL 2147218, at *5 (D.N.J. May 26, 2011) (finding that plaintiff's inconsistent statements on a central issue in the case demonstrated either "an intentional effort" to mislead the court about the basis for her lawsuit or "a significant carelessness about . . . highly material facts"); *Sloane v. Gulf Interstate Field Servs., Inc.*, Civ. A.

No. 16-1571, 2017 WL 1105236, at *5 (M.D. Pa. Mar. 24, 2017) (finding inadequacy because proposed class representative was an alcoholic and addict with a lengthy criminal record who had offered a "shifting story" regarding an issue that would be "placed front-and-center" before the jury).

While there are certainly questions regarding Harris' and Williams' testimony and allegedly falsified timesheets, the questions do not raise a fundamental concern as to their ability to represent the putative class as the issues in Sweet Home's cited cases did. Moreover, concerns regarding the Named Plaintiffs truthfulness in their timesheets are unlikely to become central issues in the case because they do not defeat the claims that Sweet Home misclassified certain employees as independent contractors and unlawfully failed to pay its home healthcare workers the overtime rate.

b.    *Plaintiffs' counsel is adequate.*

Courts must also evaluate the adequacy of class counsel, considering factors including: 1) "the work counsel has done in identifying or investigating potential claims in the action"; 2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; 3) "counsel's knowledge of the applicable law"; and 4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

The Court is satisfied that Plaintiffs' attorneys have the experience and qualifications to handle this litigation. Plaintiffs' attorneys have submitted a "Statement of Qualifications" detailing their extensive experience handling class action lawsuits. (Pls.' Class Cert. Br. Ex. 8.) Moreover, counsel has done considerable work to prosecute this action and appears willing to continue to commit significant resources to its representation of the class. Sweet Home does not object to counsel's capabilities.

14

Sweet Home does, however, protest Amy Brandt's representation of the plaintiffs because of her connections to its competitor, Vital Support. (Defs.' Resp. at 30.) Sweet Home points out that Brandt's spouse has acted as counsel to Vital Support and that Harris and Williams were referred to Brandt's firm by a supervisor at Vital Support. (*Id.*) However, Sweet Home does not cite any caselaw suggesting that this circumstance should disqualify Brandt or that it would make her a less zealous advocate. Without more, the Court declines Sweet Home's invitation to delve into a cynical inquiry as to the reasons behind an ostensibly legitimate lawsuit. The Court will appoint Weir & Partners as class counsel.

### C.    Rule 23(b)(3) Requirements

#### 1.    Ascertainability

As noted, the Third Circuit has recognized an implicit requirement for class certification under Rule 23(b)(3) that the class be ascertainable. *Marcus*, 687 F.3d at 592–93. The ascertainability requirement "eliminates serious administrative burdens . . . by insisting on the easy identification of class members," "protects absent class members by facilitating the 'best notice practicable,'" and "protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." *Id.* at 593 (internal quotation marks omitted).

To meet the ascertainability requirement, plaintiffs must satisfy two elements. *Byrd v. Aaron's, Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). First, they must show that the class can be ascertained based on objective criteria, as opposed to "subjective criteria, such as class members' state of mind." *City Select Auto Sales v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 439 n.3 (3d Cir. 2017). Second, plaintiffs must demonstrate that "there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd*, 784 F.3d at 163 (internal quotation marks omitted). Plaintiffs are not required

to identify all potential class members to meet this requirement; rather, they must simply show that "class members *can* be identified." *Id.* (internal quotation marks omitted).

This case does not raise significant issues relating to ascertainability. Plaintiffs seek to certify a class of HHAs and DCWs who have worked for Sweet Home within the three years prior to the filing of this lawsuit and logged overtime hours without being paid at the proper rate. This definition meets the "objective criteria" element of the ascertainability requirement. Workers were either HHAs or DCWs for Sweet Home or they were not; similarly, workers either worked overtime without being properly compensated or they did not.

Plaintiffs have also demonstrated that there is a "reliable and feasible mechanism" for determining whether putative class members worked as an HHA or a DCW and whether they worked overtime without proper compensation. Plaintiffs point to Sweet Home's business records, including a worker list which designates certain workers as "Direct Care Worker[s]" or "Home Health Aide[s]." (Worker List.) This list provides a simple mechanism that satisfies the ascertainability requirement on the issue of worker classification. In addition, Plaintiffs rely on workers' timesheets and Sweet Home's payroll records to establish which workers worked overtime without proper compensation. (*See* Brandt Decl.) These records will provide a reliable and feasible mechanism for determining which putative class members are included in the class.

Sweet Home argues that the worker list is insufficient to establish ascertainability because certain workers are not classified by job title in the list. Specifically, Sweet Home notes that under the job title heading, the list identifies certain workers' positions but lists other workers' positions as "[None Set]." (*See* Worker List.) But plaintiffs are not required to demonstrate at the class certification stage "that a single record, or set of records, conclusively establishes class membership." *City Select*, 867 F.3d at 441. It is clear that Sweet Home

16

maintained records that may be used to identify a large number of the putative class members; where the records are deficient, they may be supplemented with affidavits from class members. *Id.* Moreover, if the Court finds there is no feasible mechanism for determining whether unclassified workers were either HHAs or DCWs, the class can simply proceed without the unclassified workers. The ascertainability requirement does not impose an "underinclusivity" standard; "[i]ndividuals who are injured by a defendant but are excluded from a class are simply not bound by the outcome of that particular action." *Byrd*, 784 F.3d at 167.

### 2.    *Predominance*

Rule 23(b)(3) requires the court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members." The purpose of the requirement is to determine whether the proposed class is "sufficiently cohesive" to warrant class treatment. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

The predominance inquiry is similar to, but more stringent than, the commonality inquiry under Rule 23(a)(2). *See Peroxide*, 552 F.3d at 311. Because of this, it is appropriate to treat the commonality inquiry as subsumed into the predominance inquiry in Rule 23(b)(3) class actions. *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015).

The predominance inquiry considers whether the common issues in a putative class action "are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotation marks omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages . . . ." *Id.* (internal quotation marks omitted). In analyzing the predominance factor, courts must determine

not only whether there are common questions of law or fact, but whether those questions are capable of class-wide answers through common evidence. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

To succeed on the merits in this case, the primary issues the Named Plaintiffs and the putative class members must establish are that: a) they are properly classified as employees under the PMWA, rather than independent contractors; and b) they worked overtime hours. *Alers v. City of Phila.*, 919 F. Supp. 2d 528, 560 (E.D. Pa. 2013). In addition to these issues, to succeed on the pre-July 2016 overtime claims, Plaintiffs and the "unpaid overtime" class members must establish that they were not paid at the proper rate for the overtime hours they worked. Meanwhile, for the post-July 2016 claims, Harris and the "wage manipulation" class members must show that Sweet Home altered their wage rates to avoid paying the proper overtime rate and that this manipulation policy was unlawful under the PMWA. As explained below, the Court finds that the common issues of law and fact are more prevalent and important than the non-common issues. Therefore, both predominance and commonality are satisfied.

> a.   *Common evidence predominates on the question of whether the putative class members were employees.*

In order to be entitled to overtime pay, Plaintiffs and all class members must show that they were employees rather than independent contractors, since the latter are not protected by the PMWA. *Commonwealth Dep't of Labor and Indus. v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003). To determine whether a worker is an employee under the PMWA, Pennsylvania courts use the "economic reality" test, which looks at the totality of the factual circumstances of employment. *Id.* The PMWA economic reality test considers six factors:

> 1) the degree of control exercised by the employer over the workers; 2) the worker's opportunity for profit or loss depending upon managerial skill; 3) the alleged worker's investment in equipment or material required for the tasks or the

18

employment of helpers; 4) whether the service rendered requires special skill; 5) the degree of permanence of the working relationship; and 6) the extent to which the work is an integral part of the employer's business.

*Id.* The test ultimately seeks to determine whether the workers "are dependent upon the business to which they render service." *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981).

Because of the fact-intensive nature of the economic reality test, Sweet Home argues that Plaintiffs cannot show that common proof will predominate on the question of whether they were employees. (Defs.' Resp. at 19–20.) Plaintiffs, on the other hand, argue that they can rely largely on common evidence, noting that the job descriptions and duties of HHAs and DCWs are very similar. (Pls.' Reply at 3–5.) Plaintiffs also argue that the Third Circuit has held that workers' statuses can be proved through common evidence of the employer's right to control them, citing *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314 (3d Cir. 2016). The Court disagrees that *Jani-King* controls in this case;[3] however, as discussed below, the Court finds that common evidence will predominate on the question of whether the workers here were employees or independent contractors. With regard to the "opportunity for profit or loss" and "integral part of the employer's business" factors, the Court finds that common evidence will easily predominate. Common evidence will also predominate on the "special skills" factor, and on the "investment in materials" factor. In addition, while the Court finds that there will be individual issues with regard to the "degree of permanence" and "degree of control" factors, there will be some

---

[3] *Jani-King* involved a claim under the Pennsylvania Wage Payment and Collection Law, which employs a slightly different test than the PMWA to determine an employee's status. The WPCL test considers the employer's *right* to control the workers, while the PMWA test looks at the employer's *actual* control. *Compare Jani-King*, 837 F.3d at 320 (WPCL test) *with Lili v. Hyatt Hotels Corp.*, Civ. A. No. 15-5371, 2017 WL 5128173 (E.D. Pa. Nov. 6, 2017) (PMWA test).

common evidence on each; with regard to the "degree of control" factor, the common evidence will ultimately predominate.

*Opportunity for profit or loss; integral part of employer's business.* Common evidence will undoubtedly predominate on the second and sixth factors—the opportunity for profit or loss based on managerial skill and the extent to which the work is an integral part of the employer's business—because of the nearly identical positions held by the putative class members. These factors focus largely on the nature of the position held, rather than on the experience of an individual worker. Both HHAs and DCWs performed similar work, providing in-home services to Sweet Home's consumers, and were therefore similarly integral to Sweet Home's business. As to the profit or loss factor, plaintiffs were all hourly workers in similar, non-managerial positions. Thus, there are unlikely to be significant individual factual issues with regard to these factors.

*Special skills.* With regard to the special skills factor, the focus is not so much on whether the worker *has* special skills but whether she "use[s] those skills in any independent way." *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1295 (3d Cir. 1991). Even skilled workers who do not exercise their skills independently will not necessarily be found to be independent contractors. *Id.* "Routine work which requires industry and efficiency is not indicative of independence and nonemployee status." *Id.* The question at the class certification stage, then, is whether the workers could rely on common evidence to show that they did routine work and did not exercise their skills in an independent way.

Here, the workers were each assigned to a specific consumer with a detailed service authorization form explaining what care the consumers needed. (Pls.' Reply at 3; Ex. L.) The sample form offered by Plaintiffs provides a detailed outline of services to be provided, such as

hair care, meal preparation, and laundry. (*Id.*) The form also provides the number of hours to be spent on each task. (*Id.*). Similar forms were provided to Sweet Home and its workers for each consumer. (Pls.' Reply at 3.) Thus, although the workers may have received varying amounts of training, as Sweet Home notes (Defs.' Resp. at 20), their similar roles at Sweet Home and the companies' similar procedures mean that common evidence—such as the service authorization forms—will predominate on this factor.

*Investment in materials.* The Court agrees with Plaintiffs that the testimony from Harris and Williams provides common evidence on this factor. Williams testified that Sweet Home provided supplies such as gloves and sanitizer when she asked for them, and that she did not need other tools or supplies. (Pls.' Reply Ex. E [T. Williams Dep.] at 102.) Harris similarly testified that Sweet Home provided him with tissues. (Pls.' Reply Ex. F [Harris Dep.] at 108.) Based on this, the Court finds that whether workers invested in equipment and materials can be answered primarily through representative testimony from the class representatives regarding whether or not Sweet Home supplied the materials needed by workers.

*Degree of permanence of the working relationship.* Under the degree of permanence factor, courts consider "the exclusivity, length, and continuity of the relationship." *Zanes v. Flagship Resort Dev., LLC*, Civ. A. No. 09-3736, 2012 WL 589556, *6 (D.N.J. Feb. 22, 2012). This factor will be difficult to prove through common evidence, because it asks about the individual experience of each worker. In addition, both Harris and Williams offered testimony that appears to raise individual issues. Harris stated he had other employment while working at Sweet Home (Defs.' Resp. at 20), while Williams said she left Sweet Home when her consumer became a customer of Vital Support. (T. Williams Dep. at 122.) On the other hand, Sweet Home's managerial employees' declarations suggest Williams' example may be less unique than

it appears. Both of the managers stated that HHAs and DCWs "frequently move their consumers" between one third-party agency and another. (Person Decl. ¶ 16; Ervin Decl. ¶ 14.) Both of these employees claim to be familiar with these practices. Thus, although that the Court does not find that common evidence will predominate on this factor, there will likely be at least some common evidence on this issue.

*Degree of control.* This factor considers evidence such as the employer's "degree of supervision over the worker, control over the worker's schedule, and instruction as to how the worker is to perform his or her duties." *Bamgbose v. Delta-T Grp., Inc.*, 684 F. Supp. 2d 660, 669 (E.D. Pa. 2010). As Sweet Home notes, the economic reality test under the PMWA considers the employer's actual control of the worker, rather than the right to control. *Sherman*, 2012 WL 748400 at *11. Because of the emphasis on actual control, written employment agreements and policies alone cannot satisfy the factor. *See Spellman v. Am. Eagle Exp., Inc.*, Civ. A. No. 10-1764, 2013 WL 1010444, at *3–4 (E.D. Pa. Mar. 14, 2013). However, the Third Circuit has recognized that "the provisions of an agreement may be evidence of what the actual practice or working relationship is." *Jani-King*, 837 F.3d at 323.

Plaintiffs have demonstrated that there is substantial common evidence on the degree of control factor. They point to Sweet Home employee handbooks, employment policies, and testimony regarding Sweet Home's control over both its "employees" and "independent contractors." For instance, Sweet Home Primary Care's administrator, Shayla Person, explained in her deposition that both 1099 and W-2 workers were "told that they must report . . . changes in [their] patient's condition" to Sweet Home. (Person Dep. at 124.) In addition, deposition testimony and Sweet Home's written policies show that, among other things, both employees and independent contractors were required to go through orientation and training (*id.* at 130), and

were instructed in handbooks on how to perform their work. (*See* Pls.' Reply Ex. D ["Sweet Home Policies"].) In addition, as noted above, all workers were expected to provide care as directed in their consumers' detailed service authorization forms, which also set the hours each consumer was allotted. (Person Dep. at 132; Pls.' Reply Ex. L.) As far as the Court can tell, Sweet Home received service authorization forms for both employees and independent contractors. Employees and independent contractors were also subject to similar dress code policies and competency evaluations (Sweet Home Policies).

Moreover, while Sweet Home's managers' declarations submitted in support of its response to class certification observe that DCWs are not required by the government to receive training (*see* Person Decl. ¶ 18), the certifications offered by these managers in support of Sweet Home's response to Plaintiffs' motion for FLSA collective certification state that "some training is required" for both HHAs and DCWs, suggesting that Sweet Home itself may have had training requirements beyond those in the regulations. (Defs.' Resp. to FLSA Collective Cert. Exs. A [Person Cert.] ¶6 and B [Ervin Cert.] ¶6.)

Sweet Home argues that the written policies Plaintiffs point to are irrelevant to the degree of control analysis because those policies were not carried out in practice. It therefore suggests that individualized inquiry is required as to each worker's experience. Sweet Home cites testimony from Harris and Williams that they received little to no oversight and never received training from Sweet Home. (*See* Defs.' Resp. at 20; Defs.' Sur-Reply at 4–5.)

The cited testimony does raise individual factual issues. However, the Court is not persuaded that these issues will predominate over the common issues. As noted, written agreements and policies can be used as evidence of the working relationship. *Jani-King*, 837

F.3d at 323. Ignoring such evidence would mean failing to consider the "totality of the circumstances." *Stuber*, 822 A.2d at 874.

Of course, where the employer's practices are inconsistent with its written policies, the employer's actual practices will win out in the actual control analysis. And Sweet Home is correct that Harris' and Williams' testimony suggests their experiences were contradictory to Sweet Home's employment policies. However, Sweet Home's declarations and certifications demonstrate that there is also common evidence regarding the company's lack of adherence to its common policies. The certifications cited above claim that both HHAs and DCWs "work off-site with little supervision," and are generally "responsible for performing their work unsupervised." (Person Cert. ¶¶ 4–5; Ervin Cert. ¶¶ 4–5.) These statements demonstrate that Sweet Home's managerial employees are able to testify as to the company's common practice. This is additional common evidence—again adverse to the class—on Sweet Home's degree of control over the workers.

Thus, although there may be substantial individual evidence on the degree of control factor, the Court finds that the common evidence—Sweet Home's written policies and testimony regarding its adherence or lack thereof to those policies—will predominate.

Sweet Home's workers, both HHAs and DCWs, were in largely identical roles vis-à-vis Sweet Home. Because of this, not surprisingly, there is significant common evidence regarding the workers' status under the economic reality test in this case. While there are individual factual circumstances to consider with regard to some of the factors, the Court finds that the common issues will predominate.

> b.    Common questions and answers will predominate as to whether class members worked over 40 hours per week without proper overtime pay.

Because the PMWA parallels the FLSA in many aspects, PMWA overtime claims are analyzed under the same framework as FLSA claims. *Alers*, 919 F. Supp. 2d at 560; *Stuber*, 822 A.2d at 873, *aff'd*, 859 A.2d 1253 (Pa. 2004). Thus, as with FLSA claims, in order to succeed on their PMWA overtime claims, Plaintiffs must prove that they worked more than 40 hours a week without adequate compensation. *Alers*, 919 F. Supp. 2d at 560. At the class certification stage, the question is whether common evidence will predominate on this issue.

Plaintiffs may rely on defendants' payroll records to establish common evidence of unlawful payroll practices. *See, e.g.*, *Mendez v. U.S. Nonwovens Corp.*, 314 F.R.D. 30, 59 (E.D.N.Y. 2016) (explaining that inquiries regarding whether workers worked overtime and were adequately compensated "can be decided by mechanically referring to a defendant's payroll records"); *Clark v. Honey-Jam Cafe, LLC*, Civ. A. No. 11-3842, 2013 WL 1789519, at *2 (N.D. Ill. Mar. 21, 2013) (finding that employer's time and payroll records could establish predominance on FLSA wage rate issue). Here, Plaintiffs intend to rely on Sweet Home's payroll records to establish that they worked overtime without adequate compensation. (Pls.' Class Cert. Br. at 7; Brandt Decl.) This is true for both the "unpaid overtime" class members and the "wage manipulation" class members. Thus, Plaintiffs have shown that they can prove these central facts through common evidence.

Sweet Home argues that its payroll records cannot be used as common evidence because the Named Plaintiffs' timesheets—which their payroll records were based on—were inaccurate. Among other things, it notes that Harris and Williams performed personal activities on the job without recording them, were overpaid for certain weeks, and that Williams' timesheets do not

reflect when she arrived late to work. (Defs.' Resp. at 17–18.) Thus, Sweet Home argues that whether each class member actually worked more than forty hours per week is "not answerable by common proof" because the Court would have to resort to individualized inquiry into the accuracy of each class member's timesheets. (Defs.' Sur-Reply at 9.)

Sweet Home's argument, essentially, is that it should not be bound by inaccurate timesheets even though it has already recorded the hours in those timesheets and paid the workers for those hours. This is incorrect. The PMWA, like the FLSA, places the burden on employers to "keep a true and accurate record of the hours worked by each employe[e] and the wages paid to each." 43 P.S. § 333.108. An employer "cannot discharge [his obligations under the FLSA] by attempting to transfer his statutory burdens of accurate record keeping . . . to the employee." *Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 946 (2d Cir. 1959).

Failing to hold Sweet Home to its own records would amount to excusing it from its record-keeping duty under the PMWA. The Court declines to let Sweet Home off the hook like this. If it ignored its duty, it did so "at its peril." *Id.*

This holding is bolstered by the unique circumstances in this case. Not only did Sweet Home pay its employees based on the hours recorded in their timesheets, it purportedly verified the timesheets and submitted the hours worked to a state agency for reimbursement from public funds. (Pls.' Class Cert. Reply at 6; Person Dep. at 40–42.) These facts make Sweet Home's attempt to disavow its record-keeping duty and dispute the accuracy of the timesheets all the more striking.

Sweet Home also cites several cases in which courts denied class certification because of individual proof issues regarding uncompensated work. (Defs.' Resp. at 15–17.) However, these cases are inapposite. All involved allegations that the putative class members performed work

and were never paid for it; the disputed hours were therefore not recorded. For instance, in *Diabate v. MV Transportation, Inc.*, the plaintiffs claimed that class members performed pre- and post-shift work that they were not paid for. Civ. A. No. 14-857, 2015 WL 4496616 (E.D. Pa. July 20, 2015). The court found a lack of commonality and predominance because it would have to perform an individualized inquiry into whether class members actually performed pre- and post-shift work, since the plaintiffs had not recorded the allegedly uncompensated time. *Id.* at *11.

The instant case does not require such individualized inquiry. Plaintiffs do not allege that they were unpaid for work performed; rather, they claim they were *under*paid. Unlike the plaintiffs in *Diabate*, the workers contemporaneously recorded the hours at issue in this case. Thus, whether they were underpaid can be determined simply by looking at Sweet Home's payroll records. To hold that a court must conduct an individualized inquiry into each putative class member's timesheets, particularly when the employer has ostensibly verified their accuracy, would be to effectively preclude PMWA overtime claims from class treatment.

Plaintiffs have demonstrated that common evidence will predominate on the issue of whether the class members worked overtime without proper compensation. Sweet Home's attempts to cast doubt on the accuracy of Plaintiffs' timesheets fail in light of the PMWA's imposition of a duty on Sweet Home itself to ensure its employees' timesheets are accurate.

    *c.*  *Common issues significantly outweigh non-common issues.*

As noted, the "wage manipulation" claims will rely on a slightly different legal theory than the "unpaid overtime" claims, because Harris and the affected class members must demonstrate that Sweet Home's wage manipulation policy was unlawful under the PMWA.

However, the Court finds that the common issues in this case significantly outweigh this non-common question. Thus, it does not defeat predominance.

### 3.    Superiority

The superiority requirement of Rule 23(b)(3) asks whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Courts are to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative methods of adjudication." *Prudential*, 148 F.3d at 307–08. Rule 23(b)(3) lists four factors to consider: 1) the class members' interests in individually controlling the prosecution or defense of separate actions; 2) any similar pending litigation; 3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and 4) the likely difficulties in managing a class action.

Class treatment is superior here, given the large number of putative class members and relatively small claim sizes. Although Plaintiffs have not provided the full records or analysis to demonstrate the size of each of the individual workers' claims, they have provided samples. (*See* Brandt Decl.) While Harris was allegedly deprived of nearly $10,000 in overtime pay, other Plaintiffs' and class members' claims are worth $1,000 or less. (*Id.* ¶ 10.) Many of the workers with smaller claims would have little incentive to bring individual lawsuits. *See Rouse v. Comcast Corp.*, Civ. A. No. 14-115, 2015 WL 1725721, at *5 (E.D. Pa. Apr. 15, 2015) (finding class action mechanism "particularly appropriate" because average claims were approximately $1,250). In addition, concentrating the litigation in this forum is desirable, given that the action arose from facts occurring in Pennsylvania.

## III.    CONDITIONAL FLSA COLLECTIVE CERTIFICATION

Plaintiffs also seek conditional certification of a FLSA collective action paralleling their PMWA claim. (*See* Pls.' Mot. for FLSA Conditional Collective Action Cert.) The FLSA allows for collective actions if the employees being represented by the plaintiff are "similarly situated" to the plaintiff. 29 U.S.C. § 216(b). Courts in the Third Circuit apply a two-step certification process to FLSA collective actions. *Halle v. W. Penn Allegheny Health Sys. Inc.*, 842 F.3d 215, 224 (3d Cir. 2016). The first step, conditional certification, requires only a "modest factual showing" that there is a "factual nexus between the manner in which the employer's alleged policy affected [the named plaintiff] and the manner in which it affected the proposed collective action members." *Id.* The second step, final certification, is where the court "makes a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff." *Adami v. Cardo Windows, Inc.*, 299 F.R.D. 68, 78 (D.N.J. 2014) (internal quotation marks omitted). "The 'sole consequence' of conditional certification is the dissemination of court-approved notice to potential collective action members." *Id.*

As other courts have observed, the "similarly situated" requirement for conditional certification is substantially less stringent than the Rule 23(b)(3) predominance requirement. *E.g., O'Brien v. Ed Donnelly Enter., Inc.*, 575 F.3d 567, 584 (6th Cir. 2009); *Heagney v. Eur. Am. Bank*, 122 F.R.D. 125, 127 n.2 (E.D.N.Y. 1988). And as noted above, the FLSA and the PMWA largely parallel one another. *Stuber*, 822 A.2d at 873. Thus, because the Court finds that common issues predominate on the PMWA claim, it can incorporate its Rule 23 analysis to determine that the Plaintiffs and Sweet Home's other workers are similarly situated for purposes of conditional certification under the FLSA. Harris and Williams allege that they and the putative

class members were victims of a common "policy or plan" of Sweet Home's not to pay the proper rate for overtime hours worked. *Goldman v. RadioShack Corp.*, Civ. A. No. 03-0032, 2003 WL 21250571, at *6 (E.D. Pa. Apr. 16, 2003). For the reasons discussed in the predominance analysis above, the Court finds that the Plaintiffs have demonstrated a sufficient factual nexus to merit conditional certification of a FLSA collective action. *See supra* § II.C.2.

Sweet Home argues that conditional certification should be denied because the regulations upon which Plaintiffs' overtime claims rely exceed the power of the Department of Labor. According to Sweet Home, domestic service workers such as Plaintiffs are exempt from FLSA overtime requirements. However, Sweet Home already made this argument in a motion to dismiss, which the Court denied.

At any rate, the conditional certification stage is not the appropriate time to decide the merits of this claim. *See Karlo v. Pittsburgh Glass Works, LLC*, 880 F. Supp. 2d 629, 643 (W.D. Pa. 2012) ("Nothing in the case law . . . requires a trial court to engage in a determination on the legal merits of the underlying . . . claim at the conditional certification stage."). The question at present is simply whether the workers are similarly situated. Because the Court finds that they are, the motion for conditional certification of a FLSA collective action is granted.

## IV.     SWEET HOME'S MOTION TO STRIKE

In support of their Motion for Class Certification, Plaintiffs offered a declaration from their counsel, Amy Brandt. Sweet Home has moved to strike several paragraphs of this declaration. (Defs.' Mot. to Strike.) Specifically, Sweet Home seeks to strike paragraphs 7, 10, 14, 19, and 21. Some of these paragraphs serve primarily to summarize Brandt's analysis of Sweet Home's payroll records; others offer her opinions as to Sweet Home's "regular practice"

regarding overtime pay and the similarities between the Named Plaintiffs and the putative class members. (*See* Brandt Decl.) Sweet Home claims that Brandt acted in the capacity of an expert witness in coming to these conclusions, and therefore argues that the disputed paragraphs should be stricken because Plaintiffs did not make the required expert disclosures under Rule 26(a)(2) and Sweet Home did not have an opportunity to cross-examine Brandt. (Defs.' Mot. to Strike at 5–6.)

The Court has already granted a protective order shielding Brandt from a deposition. As noted in the Court's June 26, 2017 opinion denying Sweet Home's motion for reconsideration of this order, depositions of opposing counsel are discouraged. Sweet Home has not presented a convincing reason to depart from the general rule against allowing depositions of opposing counsel. The Court has already held that it does not take an expert to do the "basic arithmetic" that Brandt performed in her analysis of Sweet Home's payroll records. And Sweet Home, of course, has access to these records.

As to Brandt's additional commentary in the declaration, the Court finds it more unhelpful than it is potentially harmful to Sweet Home. To the extent that Brandt offers opinions regarding Sweet Home's "widespread" or "regular" practices or the similarity of the class members, rather than her summarized analysis of the payroll records, she is essentially presenting legal conclusions that should be left to the briefing. The Court will not consider such statements.

## V.    DUAL CLASS AND COLLECTIVE NOTICE

Rule 23(c)(2)(B) requires courts to "direct to class members the best notice that is practicable under the circumstances." In addition, district courts have authority to "facilitate the

sending of notice" to potential members of a FLSA collective action. *Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 536 (3d Cir. 2012) (internal quotation marks omitted).

The notice in this case must notify class members of both the FLSA collective action and the Rule 23 class action. The notice must therefore be carefully worded because of a key distinction between FLSA collectives and Rule 23 class actions. FLSA collectives are opt-in classes, meaning plaintiffs must affirmatively join the action to be bound by the judgment, while Rule 23 classes are opt-out, meaning class members will be bound unless they affirmatively opt out of the class. Many courts have warned about the potential for confusion when class members receive a notice informing them that they must opt in to be a part of a FLSA collective but at the same time must opt out if they wish not to be bound by the result of a Rule 23 class action involving the same subject matter. *E.g.*, *Woodard v. FedEx Freight E., Inc.*, 250 F.R.D. 178, 186 n.7 (M.D. Pa. 2008). Despite this, the Third Circuit has held that the two actions are not incompatible. *Knepper v. Rite Aid*, 675 F.3d 249, 259 (3d Cir. 2012). But because of the disparity between the two mechanisms, the Court cautions that notice in this case must be carefully drafted to avoid confusion.

Taking this caveat into consideration, the parties shall confer regarding a proposed method of individual notice to the class members of both the FLSA collective and the Rule 23 class action. The parties shall then submit a proposed notice to the Court.

## VI.   CONCLUSION

The Court finds that Plaintiffs have met the requirements for certification of a Rule 23 class action. The Plaintiffs have also satisfied the requirements for conditional certification of a

FLSA § 216(b) collective action. Thus, the Court grants both of Plaintiffs' respective motions. In addition the Court denies Sweet Home's motion to strike. An appropriate Order follows.